IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____

| | | |
|---|---|---|
| DAVID RODRIGUEZ, | : | CIVIL ACTION |
| | : | |
| Petitioner, | : | |
| | : | |
| v. | : | NO. 11-393 |
| | : | |
| GERALD L. ROZUM, THE DISTRICT | : | |
| ATTORNEY OF THE COUNTY OF | : | |
| PHILADELPHIA, and THE ATTORNEY | : | |
| GENERAL OF THE STATE OF | : | |
| PENNSYLVANIA, | : | |
| | : | |
| Respondents. | : | |

_____

DuBOIS, J.                                                                                          June 13, 2012

**M E M O R A N D U M**

I.    INTRODUCTION............................................................................................................ 1
II.   BACKGROUND—STATE COURT PROCEEDINGS ................................................. 1
      A.    Proceedings in the Court of Common Pleas of Philadelphia County ................... 1
            1.    Testimony of Steven MacNamee ............................................................... 2
                  i.    Drug-Purchasing Relationship with Petitioner ............................... 3
                  ii.   First Meeting on February 8, 1998, and Aftermath ....................... 5
                  iii.  Second Meeting on February 8, 1998................................................ 6
                  iv.   The Shooting.................................................................................... 8
                  v.    Investigation of Shooting............................................................... 11
            2.    Testimony of Dr. Ian Hood ..................................................................... 12
            3.    Testimony of Detective Dominic Mangoni ............................................. 13
            4.    Testimony of Detective Robert Konczyk................................................. 13
            5.    Testimony of Philadelphia Police Officers Terrance Lewis, Avon Lewis, and
                  Andrew Little......................................................................................... 16
            6.    Testimony of Pierre Carter ..................................................................... 17
            7.    Testimony of Donna Marie Gatto ........................................................... 18
            8.    Testimony of Luis Casiano ..................................................................... 18
                  i.    Relationship with Petitioner, Petitioner's Drug Sales, and Prior Meeting
                        with Steven MacNamee ................................................................. 19
                  ii.   First Meeting on February 8, 1998, and Aftermath ..................... 19
                  iii.  Second Meeting on February 8, 1998................................................ 21
                  iv.   The Shooting.................................................................................... 22

      **9.**      **Testimony of Petitioner** ............................................................... **24**
          **i.**     **Drug-Selling Relationship with Steven MacNamee** ................... **24**
          **ii.**    **First Meeting on February 8, 1998** ............................................ **25**
          **iii.**   **Second Meeting on February 8, 1998, and Aftermath** .............. **26**
          **iv.**   **The Shooting** ................................................................................ **27**
          **v.**     **Inconsistencies in Police Statement** ........................................ **28**
     **10.**    **Police Statements** ....................................................................... **29**
          **i.**     **Steven MacNamee's Statement—February 13 and 18, 1998** ..... **29**
          **ii.**    **Petitioner's Statement—February 23, 1998** ............................ **30**
          **iii.**   **Luis Casiano's Statement—March 12, 1998** ............................ **31**
     **11.**    **Physical Evidence** ....................................................................... **32**
     **12.**    **Trial Judge's Ruling** ................................................................... **32**
   **B.**    **Trial Court's January 19, 2001, Opinion** ...................................... **35**
   **C.**    **Superior Court Panel Opinions on Direct Appeal** ...................... **36**
   **D.**    **Superior Court En Banc Opinion; Allocatur Denied** .................. **37**
   **E.**    **Pennsylvania Superior Court Decision in Austin That a Defendant Cannot Be Guilty of Felony-Murder if He Is Acquitted of Predicate Felony** ........................ **38**
   **F.**    **Pennsylvania Post-Conviction Relief Act Proceedings** ............ **38**
**III.**  **BACKGROUND—FEDERAL COURT PROCEEDINGS** ........................ **39**
   **A.**    **Habeas Petition; Government Response** ...................................... **39**
   **B.**    **Magistrate Judge's Report & Recommendation** ........................ **40**
   **C.**    **Petitioner's Objections to R&R** .................................................. **41**
**IV.**  **DISCUSSION** ........................................................................................ **42**
   **A.**    **Standard of Review—Magistrate Judge's Report & Recommendation** .......... **42**
   **B.**    **Standard of Review—Antiterrorism and Effective Death Penalty Act** ............. **42**
   **C.**    **Petitioner's Second Objection Is Overruled Because Retroactivity of State Courts' Construction of State Criminal Statutes Is Not Cognizable on Federal Habeas Review** ...................................... **43**
   **D.**    **Petitioner's First and Third Objections—Sufficiency of the Evidence** ............. **44**
     **1.**     **Petitioner's Inconsistent-Verdicts Argument Is Properly Construed as a Sufficiency-of-the-Evidence Claim** ................... **45**
     **2.**     **Legal Standard—Fourteenth Amendment Due Process—Sufficiency of the Evidence** ............................................... **46**
     **3.**     **Applicable Pennsylvania Law** ................................................... **46**
          **i.**     **Second-Degree Murder** .............................................................. **46**
          **ii.**    **Robbery** ........................................................................................ **47**
          **iii.**   **Accomplice Liability** .................................................................. **47**
     **4.**     **The En Banc Pennsylvania Superior Court's Decision Was Objectively Unreasonable** ...................................................... **48**
          **i.**     **The State Court Unreasonably Failed to Apply the Requirement That Petitioner Intend to Aid or Promote a Robbery** ..................... **49**
          **ii.**    **The Evidence Does Not Establish Petitioner's Intent for a Robbery to Occur** ....................................................................... **52**
          **iii.**   **The Trial Court's Verdicts and Rationale For Its Verdicts Support a Finding of Unreasonableness** ..................................... **58**
     **5.**     **Conclusion** ................................................................................... **59**

**E.      Petitioner's Aggravated-Assault and Attempted-Murder Convictions Must Also Be Vacated ....................................................................................... 59**

**V.   CONCLUSION .................................................................................................... 60**

## I.    INTRODUCTION

This is a habeas case.  Petitioner David Rodriguez was convicted of second-degree murder, aggravated assault, and attempted murder in the Court of Common Pleas of Philadelphia County on October 18, 1999.  He was sentenced to a mandatory term of life imprisonment on the second-degree murder count, and no further sentence was imposed on the other two counts.

Petitioner filed a Petition for Writ of Habeas Corpus ("Petition") under 28 U.S.C. § 2254 on January 21, 2011.  On September 29, 2011, United States Magistrate Judge Linda K. Caracappa submitted a Report and Recommendation ("R&R") to the Court, recommending that the Petition be denied.  Petitioner filed Objections to the R&R on October 17, 2011.  For the reasons that follow, the Court sustains the Objections to the R&R in part.  The Petition is granted and petitioner's second-degree murder, aggravated assault, and attempted murder convictions are vacated and set aside without prejudice to the right of the Commonwealth of Pennsylvania to grant petitioner, within 180 days, a new trial and, if petitioner is found guilty, a new sentencing.

## II.   BACKGROUND—STATE COURT PROCEEDINGS

### A.    Proceedings in the Court of Common Pleas of Philadelphia County

This case arises from petitioner's involvement in the February 8, 1998, shooting of David and Steven MacNamee by a man known only as "Macho."[1]  Steven MacNamee recovered from his injuries, but David MacNamee's wounds were fatal.  Petitioner and a co-defendant, Luis Casiano, were charged in the Court of Common Pleas of Philadelphia County with nineteen counts including murder, attempted murder, two counts of robbery, two counts of criminal conspiracy, aggravated assault, and various guns and drugs charges.  (Ct. Com. Pl. Phila. Cnty.

---

[1] As discussed infra, one witness at trial testified that petitioner's co-defendant, Luis Casiano, was the shooter, not "Macho."  This Court follows all of the state courts and assumes that Macho was the shooter.

1

Dockets, Resp. Pet. Writ Habeas Corpus ("Gov't Resp.") Ex. A, at 7.)  Petitioner and Casiano

waived their right to a jury trial and received a bench trial before the Honorable Renee Cardwell

Hughes, which took place in October 1999.  Judge Hughes found petitioner guilty of three

counts: murder in the second-degree, 18 Pa. Cons. Stat. § 2502(b); aggravated assault, 18 Pa.

Cons. Stat. § 2702; and attempted murder, 18 Pa. Cons. Stat. §§ 901, 2502.[2]  Judge Hughes

acquitted petitioner of all other charges and acquitted Casiano on all counts.

  As discussed <u>infra</u>, the single issue presented by the Petition is whether the evidence was

sufficient to sustain petitioner's convictions—a so-called <u>Jackson</u> claim.  <u>See</u> <u>Jackson v.</u>

<u>Virginia</u>, 443 U.S. 307 (1979).  Central to petitioner's claim is his argument that his conviction

for second-degree murder must be vacated because there was insufficient evidence to find that he

was guilty of the predicate felony, robbery, on an accomplice-liability theory.  In addressing the

<u>Jackson</u> claim, the Court must consider "all of the evidence admitted at trial," <u>McDaniel v.</u>

<u>Brown</u>, 130 S. Ct. 665, 672 (2010), and it may not engage in "reweighing of the facts" or

"second-guessing," <u>Cavazos v. Smith</u>, 132 S. Ct. 2, 7 n.  (2011).  Accordingly, this

Memorandum recounts in full the evidence relevant to whether petitioner was properly convicted

of second-degree murder, aggravated assault, and attempted murder, omitting any discussion of

evidence that only involved Casiano.

    **1.**  **Testimony of Steven MacNamee**

  The Commonwealth called as a witness Steven MacNamee (hereinafter "Steven

MacNamee" to avoid confusion with his brother).  Steven MacNamee had two older brothers,

David (hereinafter "David MacNamee" to avoid confusion with petitioner), and Roy.  (October

---

[2] The Commonwealth refers to petitioner not being found guilty on the last two counts.
However, the original state court record confirms that the trial court found petitioner guilty of
aggravated assault and attempted murder but did not impose any further penalty on those counts.

4, 1999, Trial Tr. ("10/4/99 Tr.") 37, 52; Oct. 6, 1999, Trial Tr. ("10/6/99/Tr.") 82.)  Along with

a man named Pierre Carter, Steven MacNamee owned a mobile-electronics store located at 6524

Lansdowne Avenue in West Philadelphia.  (10/4/99 Tr. 41.)  Steven MacNamee, David

MacNamee, Roy MacNamee, and their mother lived in the same duplex in West Philadelphia;

David, Roy, and their mother lived together upstairs, and Steven MacNamee lived downstairs.

(10/6/99 Tr. 26.)  Steven MacNamee testified at trial that he owned a properly licensed firearm

that he carried at all times in "an outside holder in clear view."  (Oct. 5, 1999, Trial Tr. ("10/5/99

Tr.") 34, 61 ("I wear my gun like I wear my clothes.  I wear it every single day, everywhere I

go.").)

### i.      Drug-Purchasing Relationship with Petitioner

Steven MacNamee testified that he knew petitioner as "Jose" and that he purchased

marijuana from petitioner about "three or four times a month" over "about a five-month period"

before the shooting.  (10/4/99 Tr. 39–40.)  Steven MacNamee claimed that he did not use

marijuana and that he made the purchases on behalf of his brother Roy, who did not have a car.

(10/6/99 Tr. 9, 29–30.)  Steven MacNamee knew a man named "Craig" who introduced him to

petitioner.  (10/4/99 Tr. 40.)  Originally, Craig made purchases from petitioner on Steven

MacNamee's behalf, but, eventually, petitioner met Steven MacNamee at Steven MacNamee's

store, and petitioner gave Steven MacNamee his pager number.  (Id. at 42, 44.)  Thereafter, when

Steven MacNamee wanted to buy marijuana, he would page petitioner, and petitioner would

meet him near the store to complete the transaction.  (Id. at 45.)  Steven MacNamee testified that

petitioner came to the store approximately eight times, all for drug transactions.  (Oct. 5, 1999,

Trial Tr ("10/5/99 Tr.") 34; 10/6/99 Tr. 10.)

When making a sale to Steven MacNamee, petitioner brought someone with him on

"[a]lmost every occasion," but the person was not always the same.  (10/4/99 Tr. 45–46.)

3

Petitioner brought his co-defendant, Luis Casiano, to one transaction about two months prior to February 8, 1998.  (Id. at 46–47.)  Steven MacNamee stated that, during these meetings, he never saw petitioner with a gun.  (10/6/99 Tr. 61.)

Steven MacNamee testified that he only purchased marijuana from petitioner for Roy— usually an ounce of marijuana for $400.  (10/4/99 Tr. 39.)  He denied selling drugs out of the beeper store.  (10/6/99 Tr. 6.)  Steven MacNamee admitted on cross-examination that he had heard of marijuana being sold for as little as about "90 to 120" dollars, but he was willing to pay up to $400 because it was "what [his] brother liked and asked for."  (Id. at 55.) Roy used marijuana as well as cocaine, although Steven MacNamee only purchased marijuana; Roy would have "teaspoons" of cocaine delivered to the house.  (Id. at 84.)  Steven MacNamee's testimony was that he himself never sold drugs and that he never inquired as to whether petitioner could sell him cocaine.  (Id. at 10; 10/4/99 Tr. 52.)

According to Steven MacNamee, when he purchased marijuana from petitioner, each transaction usually include two meetings so that Steven MacNamee could "look at the product and then go back and get the money."  (10/4/99 Tr. 28.)  "About three or four" times, Steven MacNamee took a sample to Roy for him to evaluate, although Steven MacNamee testified that could make the decision himself on most occasions based on his knowledge of marijuana quality from "the amount of times that [Steven MacNamee] sat in the room with [his] brother while he smoked it, while they talked about it."  (Id. at 29–30; 10/6/99 Tr. 7.)  Steven MacNamee further testified that "a couple of times" he had the money ready and was willing to complete the transaction "right then and there."  (10/4/99 Tr. 29.)  However, during the "last three or four dealings" before February 8, 1998, petitioner was "angry" because Steven MacNamee was not happy with the quality of the marijuana.  (10/6/99 Tr. 56.)

4

### ii.    First Meeting on February 8, 1998, and Aftermath

Steven MacNamee testified that, on February 8, 1998, he arranged a meeting to complete

a drug transaction with petitioner:

> I paged [petitioner] . . . around 1 o'clock.  He returned my call
> around 3 o'clock, and I told him the usual, which was an ounce.
> He said that he would call me back and tell me if it was going to
> happen or not, which he did.  We prearranged a meeting time
> which was about 9 o'clock and we met up.   It was David
> Rodriguez, Luis Casiano and a third man, of which I do not know a
> name or can – he's not here today.

(10/4/99 Tr. 47.)  Steven MacNamee stated that he had never seen the third man before.[3]  (Id. at

47–48.)

Steven MacNamee drove his car to "Atwood Road in front of Cassidy School"—within a

few hundred feet of the beeper store—at approximately 9:00 p.m.  (10/4/99 Tr. 48.)  The three

men got out of their car and into Steven MacNamee's car.  (Id. at 49.)  The "unknown person"

handed the marijuana—one ounce, in a sandwich bag—to petitioner, who handed it to Steven

MacNamee.  (Id. at 50.)  Steven MacNamee said that he "didn't like it" based on its "smell,

texture and look."  (Id. at 51.)  According to Steven MacNamee, he said to petitioner that he

"would take it under the conditions of bringing [him] back a better product or lower the price

$50," and petitioner agreed.  (Id. at 52.)  Petitioner further agreed that Steven MacNamee could

"take a sample" to Roy.  (Id.)

Steven MacNamee testified that he brought the marijuana sample to Roy, who said that if

petitioner "would lower the price $50, he would take it."  (10/6/99 Tr. 20.)  Steven MacNamee

paged petitioner with a "two," which meant: "I turned it down."  (10/4/99 Tr. 52.)  Steven

---

[3] Steven MacNamee described the third man was being "a lot heavier" and "darker" than
petitioner and Casiano, "very scruffy looking," with "curly" hair about four inches long and a
mustache.  (10/5/99 Tr. 22–23.)  The third man appeared to be twenty-six to twenty-eight years
old and "didn't speak English well."  (Id. at 22, 59.)

MacNamee testified: "[Petitioner] called me back at my house and told me that he wasn't going to make any money off the deal at the 350 price, that he has to get 400 for it.  I said it's not acceptable.  I will wait until next time.  He said there wasn't going to be any for a while, that there wouldn't be any for sometime. [sic]  That this is all that he had left.  I said that it didn't change anything."  (Id. at 52–53.) Petitioner and Steven MacNamee had "somewhat of an argumentative conversation," but they "finally decided to agree to the 350 price" and to meet again to finish the deal.  (Id. at 53; 10/6/99 Tr. 21.)

      Steven MacNamee testified that he did not use drugs or consume alcohol during the evening of February 8, 1998.  (10/5/99 Tr. 31.)  However, he gave contradictory testimony as to whether David MacNamee used any narcotics that evening.  On direct examination, he stated that he never saw David MacNamee using drugs on February 8, 1998.  (Id.)  However, on cross-examination, Steven MacNamee stated that he saw David MacNamee use cocaine in his bedroom "right before" Steven MacNamee's second trip to meet petitioner.  (10/6/99 Tr. 65, 81.)

### iii.     Second Meeting on February 8, 1998

      Around 10:30 p.m., petitioner paged Steven MacNamee, who drove to the intersection of Lansdowne Avenue and Atwood Road to meet petitioner.  (10/4/99 Tr. 54.)  Steven MacNamee was accompanied by David MacNamee[4] because, according to Steven MacNamee, as he was

---

[4] At trial, Steven MacNamee originally insisted that he went to the second meeting alone.  He later corrected himself:

> Q: Who else was in the car with you?
> A: No one.
> Q: With you.
> A: With me?
> Q: Anybody else besides yourself arrived there?
> A: Me, David Rodriguez, Luis Casiano and the unknown person who was sitting behind me.
> Q: Anybody else in the front, anybody else in front?

leaving Steven MacNamee asked David McNamee "if he wanted to take a ride with me.  He said sure."  (10/6/99 Tr. 25.)  When he drove to the meeting, Steven MacNamee had his gun with him.  (10/4/99 Tr. 62–63.)  Steven MacNamee parked the car "about a quarter of the way" down Atwood Road, and petitioner, Casiano, and the "unknown person" pulled up and parked directly behind him.  (10/6/99 Tr. 54–55.)  Petitioner, Casiano, and the "unknown person" got out of their car and approached Steven MacNamee's car.  (Id. at 55.)  Steven MacNamee testified that he was not troubled by the presence of two people with petitioner because it was "common" for petitioner to "bring two other people with him."  (Id. at 60–61; see also 10/6/99 Tr. 18–19.)  However, "a few times" Steven MacNamee had asked petitioner to get in the car alone, and petitioner complied; Steven MacNamee made such a request during the second meeting on February 8, 1998, because his girlfriend was waiting and he wanted to get back to her.  (10/6/99 Tr. 27, 30; see also id. at 28 ("Q: Well, what was your concern?  Just wanted to get him in the car, get it over with real fast, and just—then just leave.").)  When he "asked [petitioner] if he could get in the car alone," the "doors were already opening," all three men got into the car, and Steven MacNamee "didn't say anything after that."  (10/4/99 Tr. 55.)  On cross-examination, Steven MacNamee stated that he was not "fearful" of petitioner.  (10/5/99 Tr. 69.)

According to Steven MacNamee, "David [Rodriguez] and the unknown person got in on the driver's side and Luis Casiano got in on the passenger side."  (Id. at 55.)  The arrangement of men in the car, according to Steven MacNamee's testimony, was: Steven MacNamee in the driver's seat; David MacNamee in the front passenger seat; the unknown man in the rear seat

---

A: No one else in the front seat.
Q: What about your brother?
A: Oh, I'm sorry. I came with my brother.

(10/4/99 Tr. 55–56.)

behind the driver; David Rodriguez in the rear seat middle; and Luis Casiano in the rear seat behind the passenger.  (Id.; see also 10/5/99 Tr. 7–10.)  Steven MacNamee testified that he was "positive" about these positions.  (10/4/99 Tr. 55.)

### iv.    The Shooting

Steven MacNamee's testimony as to the events that ensued was as follows:

> I looked back to Jose and asked him if he had [the marijuana].  He proceeded to get it from the unknown person sitting behind me who handed it to Jose who then handed it up to my brother, because on the ride over there I handed him the money and asked him to count it to make sure it was right.  My brother handed him the money.  As soon as he handed him the money [petitioner] turned to Luis Casiano and started speaking in Spanish, I believe. . . . They had some words back and forth.  I told [petitioner] that I would probably call him tomorrow.[5]

(Id. at 56–57.)  Casiano's attorney, Jean Purnell, Esquire, established on cross-examination that Steven MacNamee did not mention the Spanish conversation at the preliminary hearing. (10/5/99 Tr. 67).  She then asked Steven MacNamee whether he was "concerned" by the conversation, and he responded: "No and yes at the same time.  I mean, it's uncomfortable not to know what someone is saying, but it wasn't uncommon for them to speak it, so the concern wasn't there.  They spoke Spanish regularly."  (Id. at 68.)

Steven MacNamee testified that, after he told petitioner he would call him the next day:

> I started to turn.  That's when I heard the door open.  As soon as I turned and the second I put my hand on the ignition switch, I heard a loud bang, and I immediately turned to my right.  Followed by a second, a third . . . .  Luis Casiano is standing halfway one foot out, one foot in the car.  Just shot my brother.  Turned.  I seen a hand come up on the center console and grab the marijuana and take it. I said you don't have to do this.  Immediately he fired at me again and again.

---

[5] Steven MacNamee stated once during cross-examination that the unknown man handed the drugs directly to David MacNamee, but he corrected himself and said he was mistaken.  (10/6/99 Tr. 32–35.)

(10/4/99 Tr. 57–58.)  Steven MacNamee was struck in the shoulder and in the face.  (Id. at 59–60.)  One of the bullets shattered the driver's window and the driver's rear-view mirror.  (Id. at 62.)

Steven MacNamee testified at trial that he did not know whether the unknown third person was still in the vehicle when Casiano started shooting, or what happened to the third man thereafter.  (Id. at 73–74.)  On direct examination, the first time he was asked about petitioner's whereabouts during the shooting, Steven MacNamee stated that he saw "David Rodriguez back in the seat like this [per the Court: having his hands crossed, his fists clinched, his hands crossed against his chest with one hand on each shoulder leaning back against the car seat] with the weed in his hand up against the seat."  (Id. at 60.)  When asked on direct examination a second time, during the second day of his testimony, Steven MacNamee said that after Casiano fired the first shot, "A hand came up from the center, and the only person sitting there was Jose.  I turned back again.  I seen Jose up against the back seat and he was holding the marijuana in his hand.  Luis Casiano shot."  (10/5/99 Tr. 17.)

During cross-examination by petitioner's attorney, Steven MacNamee conceded that the trial "was the first time" he "told anybody [he] saw David Rodriguez in the back holding the drugs."  (10/6/99 Tr. 45; see also 10/6/99 Tr. 53 ("Q: So are you changing your testimony now?  A: Yes.").)  Steven MacNamee admitted that, when he gave a statement to the police on February 13, 1998, he said: "One of the males must have took [the marijuana].  It was on the center console when I drove to the hospital."  (Id. at 46.)  Steven MacNamee also stated that, at the preliminary hearing, he testified that he did not see petitioner or the third man in the car when the shots were fired.  (Id. at 49–53.)

After being shot, Steven MacNamee began playing "possum like [he] was dead." (10/4/99 Tr. 62.)  Once Casiano got out of the car, Steven MacNamee drew his gun from his right waistband, which was difficult because his right arm was injured and he had to reach around with his left hand.  (Id. at 62–63; 10/5/99 Tr. 18.)  According to Steven MacNamee, he tried to get out of the car but heard another shot, so he "immediately sat back in the car." (10/4/99 Tr. 63.)  He looked at David MacNamee and saw "that he was hit and blood was coming down his face," so he "knew that [he] had to get him to a hospital."  (Id.)  Steven MacNamee began to pull out of the parking space, and as he did so, the red station wagon passed ahead of Steven MacNamee's car.  (Id. at 63–64.)  Steven MacNamee testified: "Luis Casiano was in front of a truck that was in front of me.  The car pulled in front of me.  The person—I only seen his shadow.  I can't say who, reached over and opened their rear door of the red station wagon that drove in front of me."  (Id. at 64.)  Steven MacNamee stopped his car, opened the door, and fired a shot at Casiano, who then "dove into the back seat" of the red station wagon. (Id.)  Then petitioner, Casiano, and the unknown person "hit the gas and started driving away." (Id.)  As they were doing so, Steven MacNamee fired "about five shots."  (Id. at 64–65.)

Once the red station wagon was gone, Steven MacNamee drove his car to Lankenau Hospital.  (Id. at 66.)  Steven MacNamee's testimony as to what transpired at the hospital became the subject of dispute later in the trial.  Steven MacNamee testified:

> The hospital has glass doors where the personnel sit behind with two way mirrors.  I was banging on them.  I was screaming not with me but with my brother.  My brother is shot.  Help my brother.  Finally still nobody was really reacting to what I was saying.  I looked down and noticed that there was a bullet sticking out of the front of my jacket, in which I pulled out and said look, I am shot, and I slammed it down on the table that was there.  I said, and my brother is outside and he needs attention now.

10

(Id. at 66.)  Steven MacNamee testified at trial that he did not recall giving information as to what happened to medical personnel, although he wrote down answers to "the few questions" that police asked when they arrived.  (Id. at 69.)  Steven MacNamee received treatment at Lankenau and eventually recovered from his wounds.

### v.      Investigation of Shooting

Steven MacNamee participated in an interview with the police on February 13, 1998, and he testified at trial that he recalled identifying petitioner "as being involved in the incident" when presented with a photo array by the police on February 18, 1998.  (10/5/99 Tr. 24.)

On April 22, 1998, Steven MacNamee attended a lineup at the Curran-Fromhold Correctional Facility.  The events that transpired at the lineup were the subject of significant dispute at trial, although they have only tangential relevance to the issues presently before this Court.  Steven MacNamee testified that he believed he was attending the lineup to identify the shooter or the third unknown man because he had already identified petitioner from the photo array.  (Id. at 25–26, 53.)  According to Steven MacNamee, during the lineup, he saw petitioner, which made him "very, very shocked and upset" because he "did not expect to see him there at all."  (Id. at 27.)  Steven MacNamee testified:

> I walked over to the detective to tell him my concern, and I started off whispering.  I said I am a little bit confused.  He told me to speak up.  I took another moment, and in my mind I just kept thinking and looking at Jose, and it was very bothersome and very hurtful to sit there and look at him, and at the same time I recognized Luis Casiano as being in the lineup. . . . I said to [Detective Wynn], I already picked out number two [petitioner]. He said you recognize someone.  I said yeah.  I picked out number two.  He turned the light switch on.  Ended the proceedings.  I said wait, I'm not done.  He escorted me out to talk to the DA.  I said wait, I'm not done.  And he said again talk outside with the DA.

(Id. at 27–28.)  Steven MacNamee told "the DA" and either another prosecutor or police officer that he "wasn't given a chance to pick out the other person in the lineup who [he] recognized as

11

Luis Casiano," but he was not permitted to do the lineup procedure again.  (Id. at 29.)  Steven

MacNamee testified again that he had no doubt that Casiano was the shooter.[6]  (Id. at 31.)

### 2.      Testimony of Dr. Ian Hood

Doctor Ian Hood, a Deputy Medical Examiner, was the Commonwealth's second witness.

Dr. Hood performed the autopsy of David MacNamee.  (10/4/99 Tr. 75–76.)  According to Dr.

Hood, David MacNamee's death was caused by two gunshot wounds to the right side of his

head, both from bullets fired at least a foot away—one fired "almost parallel with the side of the

skull," the other fired "[a]lmost at a 90 degree angle" to the right temple.  (Id. at 84–86.)

Dr. Hood testified that the medical examiner's office performed a toxicology study as

part of the autopsy.  The study found that cocaine and its metabolite, benzolyecgonine, were

present at levels that were "sufficient to indicate that [David MacNamee] would have been under

its influence at the time, and he was in the process of metabolizing it away . . . ."  (Id. at 83–84.)

The toxicology study did not include a test for marijuana.  (Id. at 89–90.)  Dr. Hood opined that

the levels of cocaine and metabolite were consistent with David MacNamee having "taken more

than one dose of cocaine," and being "probably high but . . . coming down."  (Id. at 84–85.)  Dr.

Hood explained that cocaine has a "half life of about 30 to 40 minutes in most people," and

---

[6] Other witnesses who discussed the lineup at trial included Detective William Wynn, Assistant
District Attorney Mary Porto, Detective Patrick Mangold, and Public Defender Helen Levin, all
of whom were present at the lineup.  Each presented substantially the same account as Steven
MacNamee, so further discussion of those witnesses' testimony is unnecessary.  Detective
Wynn's testimony established that the "prime"—the person who was the subject of the lineup—
was Casiano and that, pursuant to correctional facility policy, Casiano was permitted to select the
five individuals who appeared with him.  Casiano selected petitioner, and, because Detective
Wynn was not aware petitioner was Casiano's codefendant, petitioner appeared in the lineup as
number two.  Because Steven MacNamee selected petitioner and not Casiano, number five, the
lineup was recorded as "no identification."  (10/6/99 Tr. 192–224 (testimony of Detective
Wynn).)

"[a]fter one half life it's usually done [with] its effect, which is why cocaine usually only has a high that is about a half an hour or so in length." (<u>Id.</u> at 88–89.)

### 3.   Testimony of Detective Dominic Mangoni

Detective Dominic Mangoni, a Philadelphia Police Department homicide detective, testified for the Commonwealth.  Detective Mangoni assisted the primary detective assigned to the case was Detective Robert Konczyk, whose testimony is discussed <u>infra</u> in section II.A.4. (10/6/99 Tr. 118, 124.)  Along with Detective Konczyk, Detective Mangoni interviewed petitioner on February 23, 1998.  (<u>Id.</u> at 125.)  The majority of Detective Mangoni's testimony was repetitive as to the contents of the interview record, which was introduced into evidence and is summarized <u>infra</u> in section II.A.10.ii.  However, Detective Mangoni also testified as to the Philadelphia Police Department's unsuccessful efforts to locate the unknown third man, whom petitioner identified during the interview as "Macho."  (<u>Id.</u> at 145.)  According to Detective Mangoni, Macho is a "nickname that's very commonplace."  (<u>Id.</u> at 146.)  On cross-examination, Detective Mangoni agreed that a man named "Macho" was wanted around the time of petitioner's trial for an unrelated homicide in Philadelphia.  (<u>Id.</u> at 158.)

### 4.   Testimony of Detective Robert Konczyk

The Commonwealth presented the testimony of Detective Robert Konczyk, the Philadelphia Police Department homicide detective assigned to this case.  (Oct. 7, 1999, Trial Tr. ("10/7/99 Tr.") 21–22.)  He testified that he was assigned while Steven MacNamee and David MacNamee were still at Lankenau Hospital.  (<u>Id.</u> at 23.)  Detective Konczyk went to the hospital and saw Steven MacNamee's white car parked in front of the emergency ward with its lights on and the engine running.  (<u>Id.</u>)  Detective Konczyk observed damage to the car, "a large amount of blood, especially on the passenger front seat," and a handgun on the floor by the driver's seat. (<u>Id.</u> at 24.)  One of the receptionists told Detective Konczyk that Steven MacNamee had given

13

her a holster and a bullet that "had been in his clothing."  (Id. at 25.)  Detective Konczyk testified

that he tried to speak to Steven MacNamee immediately upon entering the hospital, but the

hospital staff did not permit him to do so.  (Id. at 27.)

Detective Konczyk visited Steven MacNamee in the intensive care unit at Lankenau

Hospital during the morning of February 9, 1998.  (Id. at 28–32.)  Detective Konczyk explained

that he was investigating what had happened the night before, and Steven MacNamee motioned

that he wanted to write something.  (Id.)  Detective Konczyk gave Steven MacNamee a piece of

paper and a pencil and asked if he knew who shot him; Steven MacNamee wrote "Jose" and

"Hoza," which Detective Konczyk understood to be "Jose" spelled phonetically.  (Id.)  Among

other questions, Detective Konczyk asked how many people were involved in the shooting, and

Steven MacNamee wrote the number three.  (Id. at 32.)  In response to whether the males who

shot him were in a car, Steven MacNamee wrote "stashan wagan," which Detective Konczyk

confirmed with Steven MacNamee meant "station wagon."  (Id. at 33.)

Detective Konczyk further testified that, after nurses worked on Steven MacNamee for a

while, Steven MacNamee was able to speak.  Detective Konczyk testified that he asked Steven

MacNamee: "what does he know about Jose, does he know where Jose lives[?]  And he shook

his head no.  But he said I do have his pager number, and I asked him what that was, and he told

me a phone number . . . and he said I also have his home phone number, and he gave me that

phone number . . . ."  (Id. at 34.)  On February 13, 1998, Detective Konczyk conducted a formal

interview of Steven MacNamee, the contents of which were detailed in an interview report

discussed infra in section II.A.10.i.  (Id. at 44–45.)  After the interview, Detective Konczyk

obtained a search warrant for the pager associated with the pager number Steven MacNamee

gave him.  (Id. at 35–36.)  From those records, he learned that petitioner was the customer

associated with the pager number and obtained petitioner's address.  Detective Konczyk then

obtained a photograph associated with a "David Rodriguez" who lived at that address, which he

showed to Steven MacNamee on February 18, 1998, as part of a series of photo arrays; Steven

MacNamee selected petitioner as the person he knew as "Jose."  (Id. at 37–39.)  Detective

Konczyk testified that he also included two photographs of Luis Casiano in the arrays because

Casiano "had a connection" to petitioner's address.  (10/7/99 Tr. 86.)  Steven MacNamee did not

select either photograph of Casiano.  (Id.)

        An arrest warrant was prepared for petitioner and was executed on February 23, 1998.

(Id. at 49–50.)  On that same day, Detective Konczyk interviewed petitioner; the interview was

memorialized in a report introduced as exhibit Commonwealth-5, discussed infra in section

II.A.10.ii.  According to Detective Konczyk's testimony on cross-examination, petitioner

answered every question he was asked.  (Id. at 112.)  Detective Konczyk also conceded that he

told petitioner Steven MacNamee's version of events before taking petitioner's statement,

although the detective could not remember if he told petitioner that Steven MacNamee said the

drug transaction was for marijuana.  (Id. at 110–11, 118–20.)  During the interview, petitioner

gave Detective Konczyk Casiano's contact information. (Id. at 58.) Detective Konczyk arrested

Casiano on March 12, 1998, and conducted an interview that was recorded as exhibit

Commonwealth-15, also discussed infra in section II.A.10.iii.  (Id.)  Asked how he conducts

interviews, Detective Konczyk stated:

> When I initially go into the room and speak to people, I just talk
> with them.  I want to see what they're about, feel them out, what
> they're going to tell me.  Whether they're going to sit there and
> just not answer, call me names, I mean, all kinds of things happen.
> So you sit and you have a conversation, try to loosen them up, to
> talk to get them – get to know what they're about before you start
> asking questions rather than just sitting downed [sic] putting pen to
> paper, and that's usually a brief conversation.

(Id. at 126.)

Detective Konczyk was subject to extensive cross-examination regarding his efforts to find Macho. He testified that, "over the course of a month," he and Detective Weaver "went to the area of 5th, 6th, Pike Street," a "heavy drug area" in which homicides often occur, and "talked to people that hang around out there, try and find anybody that they know of named Macho," but they were unsuccessful. (Id. at 79, 113.) Detective Konczyk also testified that he received a message from petitioner's father "that he saw this male known [as] Macho driving by in a white car and he had a partial tag," but Detective Konczyk stated that this information "didn't help" because the description was "only two letters, and . . . a white car." (Id. at 92–93.)

During cross-examination, Detective Konczyk had the following exchange with Casiano's attorney: "Q: You did not believe that there was a Macho involved in this? A: No ma'am. I don't believe that they went there with a male named Macho with a gun and that they don't know his name or where he lived." (Id. at 89–91.)

### 5.   Testimony of Philadelphia Police Officers Terrance Lewis, Avon Lewis, and Andrew Little

The Commonwealth called three other Philadelphia police officers— Officers Terrance Lewis, Avon Lewis, and Andrew Little—whose testimony was relevant to petitioner's claim.

Officer Terrance Lewis, a member of the Crime Scene Unit, testified as to how the crime scenes at Atwood Road and Lankenau Hospital were processed. (Oct. 12, 1999, Trial Tr. ("10/12/99 Tr.") 7–8.) He also testified regarding some of the photographs introduced into evidence, as well as his reports summarizing the physical evidence recovered at the scenes. Officer Avon Lewis, also assigned to the Crime Scene Unit, assisted in processing Steven MacNamee's vehicle and in preparing a report. (Id. at 25.) Officer Avon Lewis testified as to the photographs of the vehicle, which were introduced into evidence. (Id. at 29–31.) According

16

to Officer Avon Lewis, two fired bullet cartridge cases and two teeth were recovered from the vehicle.  (Id. at 33–34.)  The vehicle was not tested for the presence of cocaine or marijuana, but no drug paraphernalia was recovered.  (Id. at 47, 49.)

Officer Little, a police officer and firearm examiner, was the ballistician in this case.  (Id. at 52–53.)  He testified that nine used firearm cartridge cases were recovered: four forty-caliber cases from the same gun, and five nine-millimeter cases from a separate nine-millimeter weapon.  (Id. at 55–57.)  Three "40/10 millimeter" bullet jackets were recovered, one from Steven MacNamee's clothing, the other two from David MacNamee's head.  (Id. at 64.)  According to Officer Little, these jackets come from a forty caliber weapon—the cartridge is forty millimeters, but the bullet itself is only ten millimeters.  (Id. at 65.)  All three 40/10 millimeter bullet jackets were fired from the same gun.  (Oct. 13, 1999, Trial Tr. ("10/13/99 Tr.") 6–7.)

**6.     Testimony of Pierre Carter**

The Commonwealth also presented the testimony of Pierre Carter, who co-owned the pager store with Steven MacNamee.  (Oct. 14, 1999, Trial Tr. ("10/14/99 Tr.") 80–81.)  Carter recalled seeing Steven MacNamee on the evening of February 8, 1998, from about 5:00 p.m. to 8:00 p.m. at Steven MacNamee's house.  (Id. at 81, 87.)  He did not see Steven MacNamee at any other point that night and was not in the vehicle with Steven MacNamee for any kind of drug deal.  (Id. at 81.)  Carter testified that Steven MacNamee's brother Roy "gets high and he drinks," but he did not know what type of drugs Roy used.  (Id. at 86.)

Carter averred that he recognized petitioner at trial as someone called "Jose."  (Id. at 85.)  Carter stated that Jose sold Steven MacNamee weed, which Carter knew because he had seen Steven MacNamee and Jose with "weed" in the back room of the pager store.  (Id. at 89.)  Carter would see Jose "come into the store, go behind the counter, and go in the back."  (Id.)

On cross-examination, Carter denied ever dealing drugs.  (Id. at 83.)  However, he admitted that, on September 5, 1996, he was being arrested and charged with manufacturing, delivery, and possession with intent to distribute a controlled substance.  (Id. at 84.)  Carter was not convicted of that offense.  (Id.)  Carter further testified that he had a license to carry a firearm, and he carried a gun while working at the pager store.  (Id.)

### 7.   Testimony of Donna Marie Gatto

Petitioner called as a witness Donna Marie Gatto, who was working as an intake nurse at Lankenau Hospital on the night of February 8, 1998.  (10/12/99 Tr. 91.)  She testified that she saw Steven MacNamee "coming through the door in need of help," so she "approached him [and] asked what happened."  (Id. at 92.)  Steven MacNamee appeared "sluggish" and "pale," and Gatto saw a wound on Steven MacNamee's face when she approached him.  (Id. at 94.)  She did not see Steven MacNamee "yelling and screaming and begging for someone's attention," and he did not approach the emergency room counter.  (Id. at 96.)  She walked up to Steven MacNamee when he entered the building and was not behind a glass partition.  (Id. at 98–99.)  Steven MacNamee's "mouth and face was blown away to some extent," but he was able to speak intelligibly.  (Id. at 95.)  According to Gatto, Steven MacNamee told her that he "was car jacked," then he pulled a bullet from "in his clothing or in his chest."  (Id. at 92.)

### 8.   Testimony of Luis Casiano

Petitioner's co-defendant, Luis Casiano, testified in his own defense.  He generally substantiated the overall sequence of events to which Steven MacNamee testified, but Casiano's version nonetheless differed from Steven MacNamee's in many key respects.

      **i.**      **Relationship with Petitioner, Petitioner's Drug Sales, and Prior Meeting with Steven MacNamee**

Casiano, who stated that his full name is "Luis Faviano Ruiz Casiano," is petitioner's cousin. (10/13/99 Tr. 15, 48.) Casiano testified that petitioner sold "heavy weight" cocaine only and never sold marijuana or cocaine in "little packets." (Id. at 20–21.) Casiano recalled that petitioner had asked him to come to a drug transaction with Steven MacNamee on one occasion prior to February 8, 1998, although Casiano could not recall the exact date. (Id. at 22–23.) On that occasion, Casiano and petitioner drove to a store. (Id.) Casiano waited in the car while petitioner went into a "beeper store" with "something wrapped" that Casiano believed to be cocaine. (Id.) According to Casiano, he and petitioner "never" went around with guns because it "wasn't necessary." (Id. at 44.)

      **ii.**      **First Meeting on February 8, 1998, and Aftermath**

Casiano testified that the first time he saw petitioner on February 8, 1998, was around 2:00 p.m. at Casiano's aunt's house at 533 West Erie Avenue in Philadelphia. (Id. at 16–17.) Petitioner and Casiano left the house to play billiards, and after playing for fifteen or twenty minutes, they left to take a ride. (Id. at 23.) When they left the billiards hall, petitioner's beeper went off, and petitioner told Casiano "that it was Steve and he had to call him." (Id.) Petitioner and Casiano drove to Casiano's aunt's house, and petitioner called Steven MacNamee. (Id. at 24.) Casiano testified, "When [petitioner] finished the telephone conversation, he told me that we had to go there to see him to the store. So we went there. When we got there, he called first so that Steve knew that he had gotten there." (Id. at 24.)

Steven MacNamee arrived in a white car driven by a black male whom Casiano had never seen before. (Id. at 24–25.) Casiano stayed in the car while petitioner got into the white car. (Id. at 26.) Petitioner talked to Steven MacNamee and the black male for "a few minutes,"

then petitioner returned and the white car left.  (Id.)  Petitioner and Casiano returned to West Erie

Avenue, and petitioner told Casiano that Steven MacNamee was going to give "some type of

answer" by beeper as to whether "he was going to have the money to buy."  (Id. at 27–28; see

also id. at 96 (Casiano's testimony that petitioner said Steven MacNamee "had to let him know

later if he was going to have the whole amount" and that petitioner "acted as if he had been made

to waste a trip").)  Casiano testified that he understood that petitioner was going to sell Steven

MacNamee a kilo of cocaine, which would sell for "$22,000 to $25,000."  (Id. at 28.)

Sometime "late that night," while Casiano and petitioner were at Casiano's aunt's house,

petitioner got a beeper message from Steven MacNamee.  (Id. at 29.)  Petitioner called Steven

MacNamee, although Casiano did not overhear the conversation because he was in the living

room and the telephone was in the kitchen.  (Id. at 30.)  According to Casiano, Steven

MacNamee "told [petitioner] that they were going to do the deal," so Casiano and petitioner

prepared to leave to meet Steven MacNamee.  (Id.)  However, when they exited Casiano's aunt's

house, "Macho arrived in a white car."  (Id.)  Casiano stated that he knew Macho only by the

name "Macho."  (Id. at 29.)  There were two other people in the car with Macho.  (Id. at 30.)

Casiano did not know the other people, but he had seen one of them before.  (Id.)  Macho got out

of the car and started talking to petitioner about money that Macho owed petitioner.  (Id. at 31.)

As to the events that ensued, Casiano testified as follows:

> Q: Okay.  Then what happened?
> A: Macho told David that he needed another quarter of a pound of
> cocaine.
> Q: And what did your cousin respond?
> A: That he couldn't take care of him right at that moment because
> he had to take care of another client.
> Q: So then what happened?
> A: Macho said that if he could accompany him and when the deal
> was done if he could take care of him.
> Q: Who would take care of whom?

> A: David would take care of Macho.
> Q: What happened then?
> A: David said it was okay.  And then Macho told the guys in the
> white car to leave.

(Id. at 32; see also id. at 99 (Casiano's testimony on cross-examination: "Q: And that your

cousin's response [to Macho] was I have a customer that I have to take care of first?  A: Yes.  Q:

And therefore I have to do that?  A: Yeah, he couldn't take care of him before because of that,

because he had to take care of Steve.").)  Asked on cross-examination whether he thought it was

"odd" that Macho would sit in on another deal, Casiano said, "[Macho] was serious.  He was like

serious."  (Id. at 99.)  It was Casiano's testimony that he did not know if Macho had a gun when

petitioner told Macho he could come along.  (Id. at 32.)

### iii.    Second Meeting on February 8, 1998

Casiano, petitioner, and Macho drove to meet Steven MacNamee.  (Id. at 34.)  When they

arrived, petitioner called Steven MacNamee and then parked the car.  (Id. )  The white

Mitsubishi—Steven MacNamee's car—arrived and "flick[ed]" its lights, and someone in the

white car made a pointing motion. (Id.)  Casiano testified that he was able to see a second person

in the car with Steven MacNamee, but he could only tell that he "had long hair."  (Id. at 44.)

Petitioner drove to a different spot and parked; the white car parked in front of petitioner's car.

(Id. at 34–35.)  Petitioner got out of the car and told Casiano and Macho to come with him.  (Id.

at 35.)  According to Casiano, "Steve[] rolled the window down a little bit and said to my cousin

who are these people[?] He didn't want them to come into the car.  So my cousin told me that in

Spanish, and then I went back to wait in my cousin's car."  (Id. at 36.)  Casiano testified that he

never entered Steven MacNamee's car.  (Id. at 36–37.)

### iv.    The Shooting

While Casiano was waiting for petitioner, "a blue minivan arrived and parked behind the car that I was sitting at."  (Id. at 37.)  The minivan had its high beams on, and Casiano "got scared."  (Id.)  He turned to look at the minivan but could not see who was in it because of the high beams.  (Id. at 37–38.)  Then, Casiano testified, he "heard three shots" but could not tell where they were coming from.  (Id. at 38–39.)  Casiano saw petitioner "crawling on the ground and running towards our car.  He got into the car.  He started the car, and then he went alongside the [white] car . . . and then I hear more shots, and then Macho got in—Macho got out from the other side of the door of the car, and then he got into our car, and then we left."  (Id.)

Casiano's attorney questioned him at length about the details of the shooting and the immediate aftermath.  According to Casiano, when petitioner got out of Steven MacNamee's car, he had a paper bag in his hands that Casiano recognized as the paper bag containing the kilo of cocaine.  (Id. at 43.)  Casiano further testified that "[b]efore Macho got in, my cousin told me that [Macho] had fired the shots."  (Id. at 39.) When asked to clarify, Casiano stated that petitioner's exact words were "it was better for us to leave because Macho had shot one of them."[7]  (Id.)  It was Casiano's testimony that when Macho got back in the car, he was acting "like if nothing had happened," "[l]ike he was not showing that he was scared or anything like that."  (Id. at 41.)

According to Casiano, when petitioner was driving away from the incident, the blue minivan followed them.  (Id. at 43.)  Casiano was unsure how long it followed them because he was facing the front, "scared" because petitioner was "driving crazily without stopping or

_____

[7] The prosecutor asked Casiano whether his trial testimony differed from the account Casiano gave in his police statement, which was that petitioner said "this crazy dude just shot white boy." (10/13/99 Tr. 111.)  Casiano stated, "That sounds the same to me." (Id.)

anything." (Id.)  Petitioner drove the red station wagon to Whitaker Avenue, and Macho used a

public telephone to call someone to pick them up.  (Id. at 46–47.)  Someone Casiano did not

know arrived in a white four-door car and drove them to Casiano's aunt's house.  (Id.)

Casiano testified that, to his knowledge, petitioner did not want to hurt Steven

MacNamee. (Id. at 46.)  Casiano also stated that neither Casiano nor petitioner planned to rob the

MacNamees and that Casiano never instructed Macho to shoot Steven MacNamee or David

MacNamee.  (Id.)  The trial transcript further discloses that, when Casiano's attorney asked him

directly if he was the shooter, the following exchange occurred:

> Q: Mr. Casiano, you heard Mr. McNamee [sic] say that you were
> the one who shot and killed his brother David.  Did you do that?
> A: I never did that.  He's lying.  What he wants to do is for me to
> pay because they haven't found Macho.
> Q: Mr. Casiano, you heard Mr. –
> A: He has to tell the truth.  He has to tell the truth. I'm not going to
> pay here for anyone.  My family knows I am not a killer.
> MS. PURNELL: Judge, I think we're going to need a few minutes.

The trial court then took a recess.  (Id. at 39–40.)

Casiano stated that he saw Macho only once after February 8, 1998, on a street in the

vicinity of Ninth Street.  (Id. at 47.) He testified that he wrote to his family during his first few

months in prison to urge them to locate Macho.  (Id. at 57.)  He asserted that his uncle had given

"Homicide" information regarding an individual who matched Macho's description, but "they

didn't pay attention to him."  (Id.)

The prosecutor cross-examined Casiano as to why the record of his statement to police

reflected that Casiano claimed that petitioner was going to sell Steven MacNamee marijuana, not

cocaine.  (Id. at 55.)  Casiano testified that he told the police that petitioner was going to sell

Steven MacNamee a kilo of cocaine, not marijuana.  (Id.)  Casiano explained the inconsistency

as follows:

A:  [The detectives conducting the interview said that] they didn't care if it was a kilo [of cocaine] or not.  That they were going to write what Steve told them.

Q: . . . did they tell you that they were trying to make you and David Rodriguez look a little better so it will only be marijuana and not cocaine?

A:  For who to look better?

Q:  For you and David Rodriguez.

A:  I thought that it was the other way around, that they didn't want to know that Steve was buying the kilo of cocaine.

(Id. at 62–63.)

### 9.      Testimony of Petitioner

Petitioner testified in his own defense.  Like Casiano, he offered an account that mostly substantiated Steven MacNamee's version of events but differed in several key respects.

### i.      Drug-Selling Relationship with Steven MacNamee

Petitioner stated that he had known Steven MacNamee for five months before February 1998.  (10/14/99 Tr. 14.)  He testified that he met Steven MacNamee through a man named Alex when Steven MacNamee wanted to purchase a half kilogram of cocaine, but eventually he began dealing directly with Steven MacNamee, who would contact him by pager.  (Id. at 14–15.) Petitioner told Steven MacNamee that "Jose" was his name because he did not know Steven MacNamee and did not know whether Steven MacNamee was a police officer.  (Id. at 46.) Petitioner never told Steven MacNamee his real name.  (Id.)

Petitioner's testimony was that he dealt a kilogram of cocaine to Steven MacNamee once a week, every week, for five months.  (Id. at 15–17.)  He claimed that he never dealt Steven MacNamee any other drug.  (Id.)  Steven MacNamee would initiate the deals by beeping petitioner.  (Id. at 18.)  Petitioner always set the price, and it was always "21 and-a-half" or "22 and-a-half"—meaning $21,500 or $22,500.  (Id.)  Petitioner would purchase the cocaine from a supplier, paying "17, 18 [thousand]," then petitioner would add to the price before selling to

24

Steven MacNamee.  (Id. at 17.)  Petitioner and Steven MacNamee would "always" conduct the transaction in a "room in the back" in Steven MacNamee's store, where Steven MacNamee would "open the kilo and try it."  (Id. at 16.)  Petitioner testified that he never carried a weapon when he was doing transactions with Steve, and he never had anyone with him who carried a weapon.  (Id. at 27.)  However, according to petitioner, Steve "always had a gun," which he wore on his waist.  (Id. at 26.)

### ii.      First Meeting on February 8, 1998

According to petitioner, Steven MacNamee beeped him "[a]round 3:30," and then petitioner called Steven MacNamee.  (Id. at 17–18.)  When petitioner called, Steven MacNamee told him "that he needed the same," and petitioner told him that the price was "22 and-a-half.  So he told me to lower it . . . He said for me to come to the store."  (Id.)  Petitioner drove to Steven MacNamee's store with Casiano, and Steven MacNamee parked his car in front of petitioner's car.  (Id. at 18.)  Petitioner stated, "I got out of the car when he got there.  And then I got in the back and I was talking to him.  So I showed him the kilo.  So he came [and] unwrapped it.  Took a piece of rock, a piece, and said he was going to try it to see if it was the same and he was going to beep me back, and if he beep one yes, two no. . . . One meant yes, bring it.  Two, that he didn't want it."  (Id. at 18–19.)  Petitioner testified that Casiano did not enter Steven MacNamee's car during the first meeting, but "a black man who was [Steve's] partner in the store"—whom petitioner recognized as having been in the store during prior deals petitioner did with Steven MacNamee—was in the car with Steven MacNamee and petitioner.  (Id. at 31, 33, 61.)

### iii.        Second Meeting on February 8, 1998, and Aftermath

"[A]round nine," Steven MacNamee beeped petitioner with a "one."  (Id. at 19.)

Petitioner returned to the area near Steven MacNamee's store with "Lusito Casiano and

Mochito."  (Id.)  As to why Macho was present, petitioner testified as follows:

> Q: Why was Macho there?
> A:  Because before I left my house, as I was leaving to meet Steve,
> he showed up there with some people in a white car and he owe me
> some money.
> Q: Did he pay you the money?
> A: Yes, a quarter of a pound.
> Q:  And how much had he paid you?
> A: 2500.
> Q:  Did you have the quarter of a pound available?
> A.  Not at that moment.
> Q:  Why did he go in the car with you?
> A:  Because when I told him that I had a deal to do with Steve, that
> I didn't have time to go then because he was already waiting for
> me, that I was on my way to the store, Steve.  So then he told me –
> he asked me if he could come with me, to come along while I was
> doing the business with Steve.  So that when I finish that I could
> take care of him.  So I said okay.  I have to take care of him first.

(Id. at 20–21.)  Petitioner stated that he did not know Macho had a gun when Macho got in the

car.  (Id. at 26.)

> Petitioner described the events that ensued as follows:
>
> When I was getting out of the car, Luis Casiano got out and
> Mochito got out, and my cousin and I were on the sidewalk to get
> into the rear door.  The right one, not the left one.  Right before we
> were going to get in, he pulled the window down and told me that
> there were too many people.  So I told one of the guys to come in
> with me.  So Luis Casiano went back to the car.  Macho got in and
> then I got in, and we got into the car.  I was talking to Steve.  And
> Mochito give me [sic] the kilo because he was holding it.  So I
> asked him give me the kilo.  So then I gave it to the brother.  So he
> took it[8] and then he told me that he had 20 and-a-half.  So I told

---

[8] The prosecutor cross-examined petitioner extensively about the order in which the drugs and
money were passed among petitioner, Macho, Steven MacNamee, and David MacNamee,
attempting to establish inconsistencies between petitioner's statement to police and his trial

him that I had told him 22.  That if he didn't have the money, I couldn't do any deal.  So before that a van parked before the car that I was driving, and then Steve and his brother, they were looking through the mirror to the rear.  So I asked Mochito what's going on with the van because the high beams were on.  So I didn't know what kind of a van was that.  So I told him to be alert so that there wouldn't be any . . . [s]o that something wouldn't happen here.  So I am talking to Steve again and tell him that if he didn't come with the whole amount for him to call me another day or tomorrow to see if he had the full amount.

(Id. at 21–22.)  According to petitioner, Casiano was going to get in the car to help count the money.  (Id. at 31.)

### iv.   The Shooting

Petitioner provided the following testimony as to the shooting:

> Q: Did [Steven MacNamee] say whether or not he would call you tomorrow?
> A: Uh-huh, yes.
> Q: Did you in fact leave at that point or start to leave?
> A: Yes.  When he said that it was fine, that he was going to call me back, that he was going to call me the next day.  So I am getting out of the car.  When I open the door, I hear a shot and then I threw myself to the ground on the sidewalk, and then I am crawling like this down.  And I hear more shots, and then I get into my car, the one that I was driving.  And then I got in.  I turned the key on, and then I told my cousin that I didn't know what was going on here.  Then I left.  As I am getting out, I saw then that Mochito got out of the car.  Then he told me to stop, because to me they were all dead inside of the car.  I didn't know what was going on in there.  So when he opened the rear door, the left rear door in the back, he got in and then I continued.  That's when I saw the van was following us. . . .
> Q: Did you hear any shots at that time?
> A:  I heard a couple shots, but I didn't know where they were coming from.  Then I continued and the van was after me, and I was trying to get lost from the van because I thought that it was the van that was shooting at me when I left.

---

testimony.  (10/14/99 Tr. 43–45.)  However—at least in part arising from confusion with the translator—the prosecutor never clarified petitioner's testimony.

(Id. at 23–24.)  Asked on cross-examination to clarify what he meant by "to me they were all dead inside the car," petitioner testified: "I didn't know who was shooting inside the car.  So to me they killed Macho.  I don't know who killed who, because the only one that I knew had a gun in there was Steve.  So I thought they were shooting at him.  Q: And for all of those reasons that's why you thought they were all dead in the car? . . . A: No, not all of them because the only one that had a gun there was him, Steve."  (Id. at 29.)  According to petitioner, he did not see the gun on the night of February 8, 1998, but he "knew that [Steven MacNamee] always had it on." (Id. at 26.)

Petitioner testified at trial that he took the drugs with him when he left Steven MacNamee's car, but he did not take the money because David MacNamee had taken it back when the deal was unsuccessful.  (Id. at 25–26.)  Petitioner parked the car on Whitaker, and then Macho made a telephone call to someone for a ride.  (Id.)  That person showed up driving a white car and drove petitioner home.  (Id. at 25.)

At trial, petitioner testified that he did not intend to rob Steven MacNamee and that their transactions were "always fine."  (Id. at 24–25.)  According to petitioner, this deal was unusual in only two respects: it was the first time Steven MacNamee did not bring all of the money to the deal, and it took place at night outside the store instead of inside the store around 4:00 p.m., before the store closed for the day.  (Id. at 25, 27–28.)

### v.      Inconsistencies in Police Statement

The prosecutor cross-examined petitioner regarding the inconsistencies between petitioner's trial testimony and his statement to police, discussed infra in section II.A.10.ii.  Regarding the police statement, petitioner stated, "there is many things there that I have not said."  (Id. at 38.)  Petitioner denied saying the following to the detectives: "I heard a click and all of a sudden Macho pulls out a gun and shoots the guy in front of him"; "Steve was reaching

28

down to his seat when Macho shot the other guy"; "I was so close I felt the flash on my face"; "I run out of the car and as I'm getting out Macho was shooting Steve"; and "Me, Luis and Macho got into the back of Steve's car." (Id. at 38–40.)  Petitioner also claimed that he did not tell the detectives that he wanted $500 but Steven MacNamee only had $400.  (Id. at 45–46.)  Instead, petitioner testified at trial that the dispute was over $2,000—the difference between $20,500 and $22,500.  (Id.)

### 10.     Police Statements

The police statements of Steven MacNamee, petitioner, and Casiano appear on forms titled "Investigation Interview Record" and were completed by Detective Konczyk, who recorded the content of the interview by hand in a question-and-answer format.  The subject of each interview signed each page of the record of his interview.  As discussed supra, petitioner, Casiano, and Steven MacNamee were examined at trial about alleged inconsistencies between their trial testimony and their statements, and Casiano and petitioner testified that their interview records did not accurately reflect what they told the detectives.

### i.     Steven MacNamee's Statement—February 13 and 18, 1998

According to Steven MacNamee's statement, he and David MacNamee met "Jose" "to buy some weed" for "$400.00 an ounce."  (Investigation Interview Record—Steven MacNamee, Commonwealth Ex. 1, at 2.)  Steven MacNamee told police that he had never seen Jose with a gun, but "other people with Jose have guns."  (Id. at 7.)  The statement shows that Steven MacNamee said: "I had met 'Jose' about an hour or so before that at the same place.  He was with two other guys.  He tried to sell me some weed, and I didn't like the quality of it, so I told him I didn't want it."  (Id.)  Steven MacNamee and Jose exchanged "some words," and Jose "said he would get some different stuff and meet me later."  (Id.)  Steven MacNamee agreed to meet again because Jose "said he would lower the price—take $50 off."  (Id. at 3.)

As to the shooting, according to the statement, Steven MacNamee gave the police the following account:

> I pulled over to the sidewalk, and they pulled in behind me.  Jose and (2) guys got out and got in the back seat of my car.  Jose was in the middle.  Jose said this was the last weed he could get for a while.  He gave me the weed in a sandwich bag, and I laid it in the center console.  David had $350.00 and turned and handed it to Jose.  I turned to start the car.  The guy sitting behind me started to open his door.  Then I heard a shot.  I started to turn, heard another shot and saw a flash, and my window, the driver window shattered . . . the guy sitting behind my brother was shooting.

(Id. at 4–5.)  The statement also includes: "Q: What happened to the bag of weed?  A: One of the males must have took it.  It wasn't on the center console when I drove to the hospital."  (Id. at 7.)

### ii.     Petitioner's Statement—February 23, 1998

According to petitioner's statement, given on February 23, 1998, after his arrest, he met Steven MacNamee because a "guy got some weed" from petitioner and sold it to Steven MacNamee, who wanted "to deal directly" with petitioner.  (Investigation Interview Record— "David Rodriquez," Commonwealth Ex. 5, at 2.)  Thereafter, petitioner sold Steven MacNamee "weed" once per week.  (Id.)  According to the statement, petitioner said that Steven MacNamee "always carries a gun."  (Id. at 6.)

As to February 8, 1998, the investigation record states that petitioner told the police: "Steve beeped me about 3:30 in the afternoon.  He said he had the money, and to meet me at the store.  Me and Luis Faviano Reese drove to the store.  I told him $500.00 for a half.  Steve said he would call me, and punch in "1" to buy it, and "2" for no.  He beeped me about 10:00 p.m. that night, and punched "1" on my beeper . . . ."  (Id. at 2–3.)  Petitioner later clarified that "a half" meant a "half-pound of weed—marijuana."  (Id. at 8.)

The statement reflects that petitioner gave the following account of the shooting:

Me, Luis Faviano Reese, and 'Macho' drove up there. I was driving. I was driving Luis's car. 'Macho' had a gun, but I didn't know it at the time. . . . We drove up there, in front of the school, about half a block from Steve's store. I pulled over, then Steve pulled up, and parked in front of us, in a white Mitsubishi. There was another guy in Steve's car. It was the first time I ever saw him. Me, Luis and Macho got into the back of Steve's car. I was in the middle. Luis sat behind Steven MacNamee, who was driving. Macho sat behind the other guy. The other guy gave me $400.00, and I gave the bag of weed to Macho, Macho gave it up front. Steve was checking the weed. I told Steve I want the full $500.00. Steve said that's all he had—$400.00. . . . A blue van pulled up behind Steve's car. With the high beams on, coming in the back window. I thought it might have been a set up. Luis got out and got into his car. I heard a click, and all of a sudden 'Macho' pulls out a gun and shoots the guy in front of him. Steve was reaching down to his seat, when 'Macho' shot the other guy. . . . I run out of the car, and as I'm getting out, 'Macho' was shooting Steve. I run and get into the red car. . . . 'Macho' had the money with him. I took the weed back from Steve before I got out of Steve's car.

(Id. at 3–4.)

### iii.    Luis Casiano's Statement—March 12, 1998

Luis Casiano's statement was taken on March 12, 1998. According to the statement,

Casiano told police that he did not know if petitioner was selling marijuana to Steven

MacNamee. (Investigation Interview Record—Luis Casiano, Commonwealth Ex. 15, at 2.)

Detective Konczyk and Casiano had the following exchange regarding the shooting:

Q: What happened after Steve pulled in front of your car?
A: Me, David, and 'Macho' got out, and went to get in back of the white car. I started to open the back door on the passenger side, but Steve said 'That's too many guys' so I went back and sat in the Toyota, in the passenger seat. David and Macho got in the back seat of Steve's car. I was sitting for about (5) to (8) minutes, when a mini van pulled up behind me. Then I heard about (3) shots.
. . .
Q: What happened after you heard shots?
A: David got out of the white car, got out of the door behind the driver. He ran back and got in the driver seat of the red station wagon. He pulled real fast ahead beside the white car, and I heard

more shots.  Then 'Macho' got out of the white car, out the other
side (behind passenger).
. . .
Q: What did David say after getting in your car?
A: He just said we got to go, we got to go, this crazy dude just shot
white boy.
Q: What did 'Macho' say?
A: He didn't say anything.  It was like he didn't care.

(Id. at 5–6.)

### 11.     Physical Evidence

The Commonwealth introduced a large number of photographs of the white Mitsubishi in

which the shooting occurred, as well as photographs of the crime scene at Atwood Road.

(Photographs, Commonwealth Exs. 3, 16, and 19.)  One set of photographs show the markings

Steven MacNamee made during his testimony at trial as to the location of the men in the

backseat during the second meeting, demonstrating that that backseat included a "third man"

behind the driver, "Jose" in the middle, and Luis Casiano behind the passenger.  (Photographs,

Commonwealth Exs. C-3-3(i), (ii).)  The photographs are otherwise consistent with the

testimony: they show, inter alia, a significant amount of blood in the front passenger seat, blood

spatter on the right passenger window, the shattered front driver's window and rear-view mirror,

and glass on the front driver's seat.

### 12.     Trial Judge's Ruling

On October 18, 1999, the trial judge rendered her verdicts from the bench.  She acquitted

Casiano on all counts and found petitioner guilty of second-degree murder, attempted murder,

and aggravated assault.  The trial judge spoke at length about the rationale for her decisions

when announcing her verdicts, and her statements play an important role in petitioner's efforts to

seek postconviction relief.

The trial judge stated, in relevant part:

Steven MacNamee has not been completely candid with me, nor has David Rodriguez been completely candid with me, and as a result I don't know exactly what has occurred in this case.

What I do know is that David and Steven MacNamee engaged in a long relationship.  Long in the context of how drug deals go in Philadelphia.  They had a five-month relationship in which they engaged in drug sales.  I candidly don't believe that the drug sales were for marijuana, but it's immaterial. . . .

The record is uncontroverted that on February 8th, 1998, there was an agreement to have an exchange of a controlled substance and that there was a meeting and at that initial meeting there was not an agreement of the minds as to what would occur.  The record is uncontroverted that there was a subsequent meeting that evening, and that is the meeting that brings us here.

The Commonwealth has charged murder in the first degree in this case.  You need to be clear that murder in the first degree in this case can be made out with respect to the shooter.  By definition of law the nature of the killing in this case constitutes a murder of the first degree, but the law becomes more complex thereafter, and the law becomes more complex thereafter because I am required to look at the role and the participation of each party to these crimes. . . .

I need to ask David Rodriguez to stand, please. . . .

There is no conflict in this evidence that you did not shoot David MacNamee.  There has never been the contention made out by this evidence that you did not shoot David MacNamee.  The difficulty in accessing [sic] your liability in this case relates to the fact that you were in the street term the dealer.  You were the person bringing the drugs to the scene.  You were the person engaging in that undisputed act, that you were the dealer.

I find that you were also the person responsible for the presence of the unidentified third male who has been called in this courtroom Macho, that you are responsible for Macho's presence at the scene, and that there was clearly a conspiracy to sell drugs between the two of you to Steven MacNamee, that Macho was a conspirator in the crime of selling drugs to Steven MacNamee.

I find there was no conspiracy to kill David MacNamee, but that David MacNamee's death is a natural and foreseeable consequence of this unsuccessful drug transaction.  There is no evidence of

33

specific intent on your part to kill David MacNamee.  However, because you are the party that was responsible for the drug transaction and the drug transaction resulted in a robbery and a robbery is a felony crime which when attendant to a homicide results in a verdict of second-degree murder, you became responsible by operation of law by the conduct of your accomplice. So while it was not your intent, I do not believe this record makes out an intent on your part, you became responsible for the conduct of the shooter.  Accordingly, I find you guilty of second-degree murder.

I also find you guilty through the same theory of accomplice liability of aggravated assault and attempted murder of Steven MacNamee.  I do not find you guilty of firearms violations, and with respect to the drug charges, the bills specifically charge marijuana.  I find the evidence to be incredible that this case was about marijuana, and I do not find you guilty of those because the bills say marijuana, and I do not believe that this is what this case was about.
. . .

Mr. Casiano, I do not believe that the evidence substantiates that you were present in that car that night. . . . I find you not guilty [on all counts].
. . .

I find [petitioner's] culpability to be based solely on accomplice liability, and that accomplice liability extends to the fact that it was not his—I do not believe that it was David Rodriguez's intent to commit a robbery, but because he is responsible for the presence of the male identified as Macho and that because robbery is a natural and foreseeable consequence of the drug deal gone bad, that he is responsible—he is legally responsible for the attendant acts of his accomplice.
. . .

In other words, I just said it one more time.  I do not find him guilty of the robbery.  I find him guilty of the attendant consequences that stem from that.  So I found him guilty of second-degree murder, and I find him guilty of the aggravated assault and the attempted murder all on a theory of accomplice liability.

(10/18/99 Tr. 6–13.)

**B.      Trial Court's January 19, 2001, Opinion**

Pursuant to Pennsylvania Rule of Appellate Procedure 1925, which requires a trial judge

to set forth the rationale for a verdict in writing as a predicate to an appeal, the trial judge

prepared an eleven-page opinion, which was filed on January 19, 2001.[9]   The opinion addressed

the three grounds on which petitioner had appealed: (1) the evidence was insufficient to sustain

the verdict, (2) the verdict was against the weight of the evidence, and (3) trial counsel was

ineffective for failing to move to sever petitioner's case from that of his co-defendant.  (Trial Ct.

1/19/01 Op., Gov't Resp. Ex. B, at 4.)

Rejecting petitioner's sufficiency-of-the-evidence argument, the trial court wrote:

> The facts, as presented at trial and preserved on the record, present
> the threshold level of evidence necessary to prove the underlying
> felony of robbery beyond a reasonable doubt.  A person is guilty of
> a robbery if, in the course of committing a theft, he inflicts serious
> bodily injury upon another.  18 Pa. Cons. Stat. § 3701(1)(i).  As
> noted in [Commonwealth v. Munchinski, 585 A.2d 471 (Pa. Super.
> Ct. 1990)], the defendant can be convicted of the second-degree
> murder charge without being convicted of the underlying felony.
>
> The trial court found that a robbery is a reasonably foreseeable
> consequence of a drug deal gone bad.  Infact [sic], it was a direct
> and substantial factor in the death of David MacNamee.  See
> Commonwealth  v. Jackson, 1999 Pa. Super 334, 744  A.2d  271
> (1999) (The Superior Court affirmed the appellant's conviction for
> murder  under  the  accomplice  liability  theory;  where  the  court
> determined that his actions in engaging in a high speed  automobile
> race  made  it  entirely  foreseeable  that  he  or  another  could  be
> seriously  killed  or  injured  as  a  result  of    his  conduct).[10]

---

[9] There was a significant delay before petitioner's direct appeal began, apparently because "trial
counsel missed the 30-day date for filing."  (Mem. L. Supp. Pet. ("Pet'r's Mem.") 2.)
Petitioner's direct appeal rights were later restored.  Disconcertingly, the trial court stated that it
wrote its opinion without the "Quarter Session's file," noting that it was "not clear if the file
ha[d] been misplaced or lost."  (Trial Ct. 1/19/01 Op., Gov't Resp. Ex. B, at 4 n.4.)

[10] Contrary to the trial court's summary, Jackson did not involve a conviction for murder.  The
defendant in Jackson was charged with "Homicide by Vehicle, Involuntary Manslaughter,
Recklessly Endangering Another Person, Criminal Conspiracy and summary traffic violations."
744 A.2d at 272.  The Superior Court held that the defendant's "actions in engaging in [a] high-

> Furthermore, the uncontroverted testimony of the complaining witness, the defendant and his codefendant establish that the defendant was positively the principal in the drug transaction and that the third man, who has yet to be apprehended, was his accomplice. Accordingly, the defendant shares equal responsibility with his accomplice for the consequences of their criminal acts.

(Id. at 6.)   The trial court also wrote that petitioner's weight-of-the-evidence argument was "meritless as he was convicted under the theory of accomplice liability," but, in doing so, observed that it found "the testimony of David Rodriguez and Louis Casiano to be highly credible."  (Id. at 8.)

### C.   Superior Court Panel Opinions on Direct Appeal

By a two-to-one vote, a panel of the Pennsylvania Superior Court reversed petitioner's convictions.  Commonwealth v. Rodriguez, 2003 PA Super 156 (Pa. Super. Ct. Apr. 23, 2003). The majority stated that it disagreed with the trial court's conclusion that petitioner "was guilty of second-degree murder because there was an intended drug transaction and a murder is 'a natural and foreseeable consequence of this unsuccessful drug transaction'" because "[w]hile . . . the drug business is a violent one, it does not necessarily follow that every unconsummated drug transaction will result in violence."  Id. at 3–4, 12.  Quoting Commonwealth v. Waters, 418 A.2d 312, 318 (Pa. Super. Ct. 1980), the panel wrote that the government was required to "prove beyond a reasonable doubt that the killing took place during the commission of one of the listed felonies and that the defendant was part of a common design to commit the underlying felony."  Id. at 5.  Because petitioner was acquitted of robbery and "the trial court made a finding that

---

speed race, in violation of the laws designed to protect vehicular and pedestrian travelers, made it entirely foreseeable that he or another could be seriously killed or injured as a result of his conduct."  Id. at 274.  Involuntary manslaughter and vehicular homicide have different mens rea requirements from second-degree murder.  Involuntary manslaughter requires a finding that a defendant was "reckless or grossly negligent," 18 Pa. Cons. Stat. § 2504(a), while homicide by vehicle—at the time of the offense in Jackson—punished "unintentionally" causing death.  75 Pa. Cons. Stat. § 3732(a) (version effective prior to 2000 amendments).

Rodriguez had no intent to commit the robbery," petitioner could not be guilty of second-degree murder.  Id. at 6; see also id. at 7 ("Because someone could have found Rodriguez  guilty, we are meant to ignore the fact that not only was he actually found not guilty, he was also determined not to have intended the robbery.").

The dissent argued that the majority "ignore[d] the actual evidence of [petitioner's] culpability established at trial" and "focus[ed] on the perhaps ill-advised extraneous remarks of the judge."  Id. at 24 (Cavanaugh, J., dissenting).  According to the dissent, "the evidence showed that [petitioner] rendered aid to and cooperated with Macho to an extent sufficient" to establish guilt on an accomplice-liability theory.  Id. at 28.

### D.    Superior Court En Banc Opinion; Allocatur Denied

The en banc Superior Court unanimously reversed the panel's ruling and reinstated petitioner's convictions.  Commonwealth v. Rodriguez, 860 A.2d 1134, 809 EDA 2002 (Pa. Super. Ct. 2004) (en banc) (unpublished table opinion).  Emphasizing that "the trial judge's gratuitous prefatory remarks at the time [s]he rendered [her] verdicts were intended to soften the blow of the guilty verdict and were offered as a courtesy to the litigants and onlookers," the en banc court held that "culpability as an accomplice is established by proof that the defendant, with the intent to promote or facilitate the commission of the offense, did aid or attempt to aid in the commission of an offense."  Id. at 8 (citing Commonwealth v. Bachert, 453 A.2d 931, 936 (Pa. 1981)).  The en banc court concluded that the accomplice-liability standard was met because "[petitioner's] aid with the intent of promoting Macho's actions was clearly established by: (1) bringing Macho, who owed him money, to Atwood Road, where the MacNamees would be waiting with money; (2) driving Macho from the scene after the shooting; (3) taking Macho to a pay phone; (4) waiting for Macho to call others; and (5) switching getaway cars."  Id. at 10.

The Pennsylvania Supreme Court denied allocatur on March 23, 2005, terminating petitioner's direct appeal.  Commonwealth v. Rodriguez, 871 A.2d 190 (Pa. 2005).

### E.   Pennsylvania Superior Court Decision in <u>Austin</u> That a Defendant Cannot Be Guilty of Felony-Murder if He Is Acquitted of Predicate Felony

On August 21, 2006, a Pennsylvania Superior Court panel decided Commonwealth v. Austin, 906 A.2d 1213, which has figured centrally in petitioner's efforts to obtain postconviction relief.  In Austin, a jury convicted the defendant of second-degree murder but acquitted him of robbery.  Id. at 1216.  The Superior Court reviewed at length the Pennsylvania Supreme Court's decision in Commonwealth v. Magliocco, 883 A.2d 479 (Pa. 2005), which addressed the issue of inconsistent verdicts in criminal cases and held that an individual could not be convicted of ethnic intimidation when he was acquitted of the predicate offense of terroristic threats.  The Austin court distinguished Magliocco and held that, "due to the broad definition of robbery, [an acquittal of robbery] . . . negates the possibility that the homicide of [the decedent] occurred 'in the perpetration of a robbery,' the undisputed predicate offense for felony murder."  Id. at 1221.  The Austin court thus reversed the defendant's conviction for felony murder.

### F.   Pennsylvania Post-Conviction Relief Act Proceedings

Petitioner filed a pro se motion for relief pursuant to the Pennsylvania Post-Conviction Relief Act ("PCRA") in the state trial court on December 17, 2005.  (Am. Pet. Post Conviction Relief Act, Gov't Resp. Ex. H.)  His current counsel, Sonda Rodrigues, Esquire, filed an amended petition on December 15, 2006, alleging, inter alia, that petitioner's sentence violated the Eighth and Fourteenth Amendments; that his trial counsel was ineffective; and that he had

been denied due process of law.[11]  (Id. at 4.)  Petitioner argued that Austin applied retroactively

and required vacation of his conviction. (Id. at 3.)  On July 21, 2008, the Court of Common Pleas

dismissed the PCRA petition.  The court held that Austin "unequivocally" articulated a new rule

of law and, because it was decided after petitioner's direct appeal had concluded, did not apply

retroactively to petitioner's case.  (PCRA Ct. Com. Pl. Op., Gov't Resp. Ex. I, at 2.)

The Superior Court affirmed the Court of Common Pleas's PCRA ruling by a two-to-one

vote.  Commonwealth v. Rodriguez, 986 A.2d 1263 (Pa. Super. Ct. 2009) (unpublished table

opinion).  One judge dissented, however, taking the position that Austin applied retroactively

because it "merely clarified the law as it existed when [petitioner] was found guilty."  Id. at 1–2

(Op. of McEwen, J., dissenting).  The Pennsylvania Supreme Court denied allocatur.

Commonwealth v. Rodriguez, 9 A.3d 629 (Pa. 2010).

## III.    BACKGROUND—FEDERAL COURT PROCEEDINGS

### A.    Habeas Petition; Government Response

Petitioner, through counsel, filed his habeas petition under 28 U.S.C. § 2254 on January

21, 2011.  He asserts in the Petition that the "evidence was insufficient to sustain [his] conviction

for second-degree murder or aggravated assault or attempted murder."  (Pet. 5.)  Throughout the

Petition and in his memorandum, he focuses on the argument that his Fourteenth Amendment

Due Process right was violated because "he was convicted of second-degree murder when he

was acquitted of the underlying felony of robbery and was neither a co-conspirator nor an

---

[11] Petitioner asserted in his pro se PCRA petition that he could establish that he was not
responsible for Macho's presence in the vehicle through Louis Casiano's affidavit, but this
ground was not asserted in the amended, counseled petition.  The affidavit stated that Macho was
someone whom Casiano sent "him (Macho) to his [petitioner's] house to buy some drugs."  (Am.
Pet. Post Conviction Relief Act Ex. A, at 1.)  Casiano further stated that petitioner had "just met
the guy," and "after [they] left the scene, Macho even threatened [them], with bodily harm, if
[they] did not drive him where he wanted to go."  (Id.)

accomplice to the robbery." (Pet'r's Mem. 7–8.)  In support of this claim, petitioner argues that he should receive the benefit of the Pennsylvania Superior Court's ruling in <u>Austin</u> because it "merely clarified the meaning of the law as it existed at the time [he] was convicted." (<u>Id.</u> at 12.)

Respondents (collectively, "the Commonwealth") contend that "the state courts' rejection of Petitioner's sufficiency [of the evidence] claim was entirely faithful to clearly established federal law and a reasonable determination of the facts." (Gov't Resp. 17.)  Respondents argue that "[t]here was ample evidence to sustain a conviction of robbery under a theory of accomplice liability [because] Petitioner aided Macho at every stage of the crime by bringing him to the murder scene, acting in concert with him to take back the drugs while Macho shot the victims and took their money, helping Macho to flee after the murder, and then coordinating with him as to the disposition of the get-away vehicle and the drugs." (<u>Id.</u> at 28 (citations omitted).) According to respondents, petitioner's arguments about the retroactivity of <u>Austin</u> fail because "his entire challenge is predicated on an issue of <u>state</u> law, i.e., whether <u>Austin</u> 'enunciate[d] a 'new rule of law,' <u>i.e.,</u> . . . Pennsylvania case law," which "is not properly revisited [by] a federal court on habeas review." (<u>Id.</u> at 22–23 (emphasis in original).)

### B.      Magistrate Judge's Report & Recommendation

On September 29, 2011, Magistrate Judge Caracappa issued her Report and Recommendation ("R&R") that the petition be dismissed.  In her R&R, she made three conclusions of law. First, the evidence, as interpreted by the <u>en banc</u> Superior Court on direct appeal, was sufficient to support petitioner's second-degree murder conviction.  (R&R 7.) Second, the Superior Court properly rejected petitioner's inconsistent-verdicts argument.  (<u>Id.</u> at 7–9.)  Third, the PCRA court correctly determined that <u>Austin</u> did not apply retroactively to petitioner's case.  (<u>Id.</u> at 9.)

It appears from the R&R and from the record that the R&R was written without the benefit of the state court record.[12]  Thus, the R&R contains language to the effect that its recommendation is based solely on review of the <u>en banc</u> Superior Court's summary of the evidence instead of on a review of whether, as is required on federal habeas review, the <u>en banc</u> Superior Court opinion unreasonably evaluated the evidence presented at trial.  (<u>See, e.g.</u>, R&R 7–8 ("The Superior Court reiterated the evidence in detail and explained that there was sufficient evidence to prove accomplice liability for the robbery.  The Superior Court explained that an inconsistency in the verdicts is allowed and does not mean that petitioner's conviction should be overturned.").)

### C.        Petitioner's Objections to R&R

Petitioner raises three objections to the R&R.  First, he argues that the R&R wrongly concludes that "he is unable to prove that the Pennsylvania Superior Court's decision was an unreasonable application of Supreme Court precedent—namely, that the Constitutional guarantee of due process requires that the Commonwealth present evidence sufficient to prove every element of a crime beyond a reasonable doubt." (Pet'r's Objections to R&R ("Objections") 6.) Second, according to petitioner, the R&R wrongly concludes that <u>Austin</u> is a new rule of law. (<u>Id.</u>)  Third, petitioner contends that the R&R wrongly concludes that "his case is merely one of inconsistent verdicts"; petitioner argues that his conviction is based on "mere speculation as opposed to sufficient facts to support accomplice liability." (<u>Id.</u>)

---

[12] The Court further notes that, when it requested the state-court record from the Office of the Clerk of Court of the Court of Common Pleas, it originally received an incomplete record that was missing all of the trial exhibits and some volumes of trial transcripts.  The Court eventually received what it understands to be the entire original record and thanks Darrel Young of the Office of the Clerk of Court for his assistance.

IV.     **DISCUSSION**

     A.     **Standard of Review—Magistrate Judge's Report & Recommendation**

Where a court refers a habeas petition to a magistrate judge, "the court shall make a <u>de novo</u> determination of those portions of the report or specified proposed findings or recommendations to which objection is made . . . [and] the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate." 28 U.S.C. § 636(b)(1)(c). Accordingly, the Court will make a <u>de novo</u> determination of those portions of Magistrate Judge Caracappa's R&R to which petitioner objects.

     B.     **Standard of Review—Antiterrorism and Effective Death Penalty Act**

Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), "[a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  A federal habeas court reviews the decision that "either represents the state courts' last reasoned opinion on this topic" or the last decision that "has not been supplemented in a meaningful way by [a] higher state court."  <u>Bond v. Beard</u>, 539 F.3d 256, 289–90 (3d Cir. 2008).

A decision is contrary to clearly established federal law if the state court "reached a 'conclusion opposite to that reached by th[e] [Supreme] Court on a question of law or if the state court decides a case differently than th[e] [Supreme] Court has on a set of materially indistinguishable facts.'  An application is unreasonable 'if the state court identifies the correct

governing legal principle from th[e] [Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.'" Marshall v. Hendricks, 307 F.3d 36, 51 (3d Cir. 2005) (quoting Williams v. Taylor, 529 U.S. 362, 413 (2000)).

**C.      Petitioner's Second Objection Is Overruled Because Retroactivity of State Courts' Construction of State Criminal Statutes Is Not Cognizable on Federal Habeas Review**

The Court first addresses petitioner's second objection, which is that the R&R improperly concludes "that Commonwealth v. Austin . . . is a new rule of law and not a case that clarified already existing law and which should be applied to the petitioner's case." (Mem. L. Supp. Objections ("Objections Mem.") 8.) The R&R stated: "the PCRA reviewed that issue and denied it . . . explain[ing] that petitioner's direct appeal was completed prior to the new rule of law in Austin and thus Austin can not [sic] be applied retroactively to petitioner's conviction." (R&R 9.)

The R&R properly concluded that petitioner is not entitled to relief based on his disagreement with the decision of the PCRA court as to the retroactivity of Austin,[13] although this Court now amplifies the reasoning given in the R&R. As the Commonwealth correctly argues, (see Gov't Resp. 22–24), whether Austin announces a new rule or clarifies existing law is purely a matter of state law and does not implicate any right under the Due Process Clause of the United States Constitution. See Fiore v. White, 149 F.3d 221, 224 (3d Cir. 1998) ("[S]tate courts are under no constitutional obligation to apply their own criminal decisions retroactively." (citing

---

[13] Even if this Court could review the decision of the PCRA court that petitioner was not entitled to have Austin apply retroactively to his case, the Pennsylvania Superior Court's decision in Austin is no longer good law following the Pennsylvania Supreme Court's decision in Commonwealth v. Miller, issued in January 2012. Miller rejected Austin and upheld a second-degree murder conviction following an acquittal of the predicate felony, robbery. Miller, 35 A.3d 1206, 1213 (Pa. 2012) ("We reaffirm that an acquittal cannot be interpreted as a specific finding in relation to some of the evidence, and that even where two verdicts are logically inconsistent, such inconsistency alone cannot be grounds for a new trial or for reversal.").

Wainwright v. Stone, 414 U.S. 21, 23–24 (1973)), rev'd on other grounds by 531 U.S. 225 (2001); see also Henry v. Ricks, 578 F.3d 134, 141 (2d Cir. 2009) (discussing Stone and concluding that "the Due Process Clause does not require the retroactive application of a new interpretation of a criminal statute by the New York Court of Appeals [on] collateral review of a conviction"); Warren v. Kyler, 422 F.3d 132, 137 (3d Cir. 2005) ("We must . . . review for a potential violation of federal law, and . . . nothing in the Constitution requires states to apply their own decisions . . . retroactively . . . ."). Accordingly, petitioner's claim to retroactive application of Austin is not cognizable in this Court. See 28 U.S.C. § 2254(a) (limiting habeas corpus jurisdiction of to claims based "on the ground that [the petitioner] is in custody in violation of the Constitution or laws or treaties of the United States").

Thus, petitioner has no federal due process right to retroactive application of Austin to his case, and his second objection is overruled.

### D.     Petitioner's First and Third Objections—Sufficiency of the Evidence

Petitioner's first and third objections to the R&R implicate the same question: whether the R&R correctly concluded that the Pennsylvania Superior Court reasonably applied the federal due process standard regarding the evidence sufficient to support a conviction. His first objection is that the R&R wrongly states "that he is unable to prove that the Pennsylvania Superior Court's decision was an unreasonable application of Supreme Court precedent— namely, that the Constitutional guarantee of due process requires that the Commonwealth present evidence sufficient to prove every element of a crime beyond a reasonable doubt." (Objections Mem. 8–11 (citations omitted).) Petitioner's third objection is that the R&R improperly stated that this "case is merely one of inconsistent verdicts"; instead, petitioner argues, it is a case "where an individual was deprived of his Constitutional Right to Due Process by mere speculation as opposed to sufficient facts to support accomplice liability." (Id. at 18–19.) The

Court will address both objections in reviewing <u>de novo</u> petitioner's sufficiency-of-the-evidence argument with the benefit of the state court record.

### 1. Petitioner's Inconsistent-Verdicts Argument Is Properly Construed as a Sufficiency-of-the-Evidence Claim

To the extent that the Petition asserts that petitioner's sentence is <u>per se</u> unconstitutional based on the inconsistency between his acquittal on the robbery charge and his conviction for felony murder, (<u>e.g.</u>, Pet. 5), petitioner's claim is rejected.  Petitioner cannot rely on inconsistency alone as a basis for relief.  An inconsistent verdict in a state-court trial, even in a bench trial, does not violate the Fourteenth Amendment's Due Process Clause if "the guilty verdict . . . is supported by sufficient evidence and is the product of a fair trial."[14]  <u>Harris v. Rivera</u>, 454 U.S. 339, 363–66 (1981).

Accordingly, the Court turns to the central issue presented by the Petition: whether petitioner is entitled to relief based on his claim that his convictions were not supported by sufficient evidence.  The question for the Court is whether the <u>en banc</u> Pennsylvania Superior Court, in its August 11, 2004, opinion—the last reasoned state court decision—unreasonably applied the sufficiency-of-the-evidence standard in determining that petitioner's conviction should stand.[15]

---

[14] As a matter of Pennsylvania state law, verdicts in criminal cases need not be consistent and will not be reversed "as long as there is evidence to support the [guilty] verdict." <u>Commonwealth v. Swann</u>, 635 A.2d 1103, 1104–05 (Pa. Super. Ct. 1994) (citing, <u>inter alia</u>, <u>Commonwealth v. Strand</u>, 347 A.2d 675 (Pa. 1975)).  This is true in bench trials as well as jury trials.  <u>Commonwealth v. Harris</u>, 360 A.2d 728, 729 (Pa. Super. Ct. 1976).

[15] Petitioner does not contend that, in evaluating his sufficiency-of-the-evidence claim, the Pennsylvania courts applied a standard "contrary to" clearly established Pennsyvlania law; he challenges whether the standard was applied reasonably.  <u>See</u> 28 U.S.C. § 2254(d).

###### 2.    Legal Standard—Fourteenth Amendment Due Process—Sufficiency of the Evidence

"[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."  In re Winship, 397 U.S. 358, 364 (1970); see also Jackson v. Virginia, 443 U.S. 307, 316 (1979) ("Winship presupposes as an essential of the due process guaranteed by the Fourteenth Amendment that no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof—defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense."); Robertson v. Klem, 580 F.3d 159, 165 (3d Cir. 2009) (applying Jackson).  To determine if the state court's ruling comported with the requirements of due process, the Court must make "'explicit reference to the substantive elements of the criminal offense as defined by state law'" to "determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  See Orban v. Vaughn, 123 F.3d 727, 731 (3d Cir. 1997) (quoting Jackson, 443 U.S. at 319, 324 n.16); see also Coleman v. Johnson, No. 11-1053, 566 U.S. __, slip op. at 5–6 (May 29, 2012) ("[T]he only question under Jackson is whether that finding was so insupportable as to fall below the threshold of bare rationality.").

###### 3.    Applicable Pennsylvania Law

The substantive elements of second-degree murder, robbery, and accomplice liability under Pennsylvania law are as follows.

###### i.    Second-Degree Murder

The second-degree murder statute in effect at the time of the offense conduct in this case provided, "A criminal homicide constitutes murder of the second-degree when it is committed

while defendant was engaged as a principal or an accomplice in the perpetration of a felony."  18 Pa. Cons. Stat. § 2502(b) (version effective 1998).  "Perpetration of a felony" was defined as "engaging in or being an accomplice in the commission of, or an attempt to commit, or flight after committing, or attempting to commit robbery, rape, or deviate sexual intercourse by force or threat of force, arson, burglary or kidnapping." Id. § 2502(d) (version effective 1998).

### ii.        Robbery

Petitioner's second-degree murder conviction was predicated on the theory that he was engaged in a robbery.  Under Pennsylvania law, "[a] person is guilty of robbery if, in the course of committing a theft, he: (i) inflicts serious bodily injury upon another; (ii) threatens another with or intentionally puts him in fear of immediate serious bodily injury; (iii) commits or threatens immediately to commit any felony of the first or second-degree; (iv) inflicts bodily injury upon another or threatens another with or intentionally puts him in fear of immediate bodily injury; or (v) physically takes or removes property from the person of another by force however slight." Id. § 3701(1) (version effective 1998).  An act is "'in the course of committing a theft' if it occurs in an attempt to commit theft or in flight after the attempt or commission." Id. § 3701(2).  "Serious bodily injury" is "[b]odily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ."  Id. § 2301.

### iii.        Accomplice Liability

"A person is an accomplice of another person in the commission of an offense if: (1) with the intent of promoting or facilitating the commission of the offense, he: (i) solicits such other person to commit it; or (ii) aids or agrees or attempts to aid such other person in planning or committing it; or (2) his conduct is expressly declared by law to establish his complicity."  18 Pa. Cons. Stat. § 306(c) (version effective 1998) (emphasis added).

47

The Pennsylvania Supreme Court has held that "two prongs must be satisfied for a defendant to be found guilty as an 'accomplice.'"  Commonwealth v. Murphy, 844 A.2d 1228, 1234 (Pa. 2004) (citing Commonwealth v. Woodward, 614 A.2d 239, 242 (Pa. Super. Ct. 1992)). To establish accomplice liability:

> First, there must be evidence that the defendant intended to aid or promote the underlying offense. Second, there must be evidence that the defendant actively participated in the crime by soliciting, aiding, or agreeing to aid the principal.  While these two requirements may be established by circumstantial evidence, a defendant cannot be an accomplice simply based on evidence that he knew about the crime or was present at the crime scene. There must be some additional evidence that the defendant intended to aid in the commission of the underlying crime, and then did or attempted to do so.  With regard to the amount of aid, it need not be substantial so long as it was offered to the principal to assist him in committing or attempting to commit the crime.

Id. (citations omitted).

### 4.    The En Banc Pennsylvania Superior Court's Decision Was Objectively Unreasonable

Shorn of tangential matters like retroactivity and inconsistent verdicts, the issue in this case is whether the en banc Superior Court unreasonably concluded that there was sufficient evidence to sustain petitioner's second-degree murder conviction on a theory that he was an accomplice to robbery.  Felony murder must be premised in this case on the predicate offense of robbery, not on any drug distribution offense, see 18 Pa. Cons. Stat. § 2502(d) (limiting predicate felonies for second-degree murder to "robbery, rape, or deviate sexual intercourse by force or threat of force, arson, burglary or kidnapping"), and the Commonwealth has not made any argument to the contrary.  The state court's analysis of this issue was that "[petitioner's] aid with the intent of promoting Macho's actions was clearly established by: (1) bringing Macho, who owed him money, to Atwood Road, where the MacNamees would be waiting with money; (2) driving Macho from the scene after the shooting; (3) taking Macho to a pay phone; (4) waiting

48

for Macho to call others; and (5) switching getaway cars." Rodriguez, 809 EDA 2002, at 10.  In its brief, the Commonwealth offered only one paragraph of argument on this issue, but its logic parallels that of the en banc Superior Court.  The Commonwealth argues: "Petitioner aided Macho at every stage of the crime by bringing him to the murder scene, acting in concert with him to take back the drugs while Macho shot the victims and took their money, helping Macho to flee after the murder, and then coordinating with him as to the disposition of the get-away vehicle and the drugs."  (Gov't Resp. 28.)

     This Court concludes that the en banc Superior Court's decision is unreasonable primarily because it eviscerated the "intent" requirement of accomplice liability—the requirement that the evidence show petitioner "intended to aid in the commission of the underlying crime" of robbery.  Murphy, 844 A.2d at 1234; Commonwealth v. Mikell, 729 A.2d 566, 569 (Pa. 1999) ("The malice or intent to commit the underlying crime is imputed to the killing to make it second-degree murder, regardless of whether the defendant actually intended to physically harm the victim." (emphasis added)).  This Memorandum addresses that issue first. Then it addresses the state court's failure to require that the homicide occur during the perpetration of the predicate felony.  Following that, the Court addresses the absence of evidence in the record that petitioner intended for a robbery to occur on February 8, 1998, concluding that, even if the en banc Superior Court had applied the correct intent standard, the evidence was constitutionally deficient to sustain petitioner's conviction.  Finally, the Court discusses other circumstances that show the unreasonableness of the state court's decision in this case.

> **i.      The State Court Unreasonably Failed to Apply the Requirement That Petitioner Intend to Aid or Promote a Robbery**

     The state court acted unreasonably in focusing on whether petitioner "intended to aid or promote" Macho's actions generally instead of, as Pennsylvania law requires, determining

whether the evidence established that petitioner intended to aid or promote a robbery.  Tellingly,

throughout the relevant portion of its opinion, the en banc Superior Court never confronted

whether petitioner had "the intent of promoting or facilitating the commission" of robbery, as the

statute requires.  See, e.g., 18 Pa. Cons. Stat. § 306(c).  It held instead that "the evidence showed

that Rodriguez aided and cooperated with Macho" and that petitioner acted "with the intent of

promoting Macho's actions," and it quoted Commonwealth v. Everett, 443 A.2d 1142, 1145 (Pa.

Super. Ct. 1982), for the proposition that an accomplice "is equally criminally liable if he aids

that person with the intent of promoting that person's act."  Rodriguez, 809 EDA 2002, at 10.

Critically, nowhere did the state court discuss whether the evidence showed that petitioner

intended for a robbery to occur, which is essential to establish felony murder liability under both

the applicable statute and the case law.[16]  E.g., 18 Pa. Cons. Stat. § 306(c); Murphy, 844 A.2d at

1234.  None of the factors the en banc Superior Court cited—bringing Macho to Atwood Road,

driving Macho to a payphone that Macho used to call others, or switching "getaway cars"—

demonstrates that petitioner intended that either he or Macho would rob the MacNamees.  As the

Superior Court panel that originally reversed petitioner's conviction held, "[A]ccepting the

Commonwealth's position would force us to eviscerate the statutory requirements for a finding

of second-degree murder.  As repeatedly noted, a finding of guilt of second-degree murder

requires the finding of, at least, the intent to commit one of the listed felonies.  That finding

simply does not exist here."  Rodriguez, 2003 PA Super 156, at 7.

---

[16] This Court's task is to evaluate the en banc Superior Court opinion, but the Court notes that
the trial court likewise failed to apply the correct theory of felony murder liability.  The trial
court, borrowing from tort law, held, "[A] robbery is a reasonably foreseeable consequence of a
drug deal gone bad.  Infact [sic], it was a direct and substantial factor in the death of David
MacNamee."  (Trial Ct. 1/19/01 Op. 6.)  As discussed supra in note 9, the trial court cited a
vehicular homicide case to support its conclusion, but vehicular homicide has a different mens
rea standard.

There is a second grave shortcoming in the en banc Superior Court's analysis: to the extent that its opinion states that petitioner's liability derives from his conduct after the shooting, that court erroneously and unreasonably applied the substantive elements of second-degree murder.  The state court emphasized in its opinion that "perpetration of a felony" as defined in Title 18, Section 2502(d) of the Pennsylvania Consolidated Statutes includes being an "accomplice" to "flight after committing" robbery.  Rodriguez, 809 EDA 2002, at 9.  Taken in isolation, that is a correct statement of the law.  It does not alter the fact, however, that felony murder only occurs if the killing "is committed while defendant was engaged as a principal or an accomplice in the perpetration of a felony."  18 Pa. Cons. Stat. § 2502(b) (emphasis added).  It is uncontested that the shooting in this case took place in the MacNamees' car, not during flight from the scene.  Accordingly, it is not enough to say that petitioner was an accomplice to fleeing from the scene of a robbery.  Instead, the evidence must show that the shooting of the MacNamees occurred during a robbery and that petitioner intended to aid in the commission of that robbery.

None of the five factors on which the en banc Superior Court relied to establish petitioner's intent were responsive to that inquiry.  Four of them involved petitioner's actions after the shooting: "(2) driving Macho from the scene after the shooting; (3) taking Macho to a pay phone; (4) waiting for Macho to call others; and (5) switching getaway cars."  Rodriguez, 809 EDA 2002, at 10.  Those facts are circumstantial evidence that may tend to establish guilt, but they cannot, on their own, establish felony murder liability based on flight from a robbery.  Moreover, as the Court discusses further infra, they are not sufficient to sustain petitioner's conviction.

Because the en banc Superior Court failed to apply the requirement that petitioner have "the intent of promoting or facilitating the commission" of a robbery, it erred in concluding that all elements of second-degree murder were shown beyond a reasonable doubt and affirmed petitioner's conviction in violation of the Due Process Clause of the Constitution.

### ii.     The Evidence Does Not Establish Petitioner's Intent for a Robbery to Occur

Having concluded that the state court unreasonably failed to apply the requirement that every element of the Pennsylvania second-degree murder statute must be shown beyond a reasonable doubt, the Court must determine whether the record nonetheless contained sufficient evidence to sustain petitioner's conviction, looking at the entirety of the record without regard to whether such evidence was properly admitted.  See Jackson, 443 U.S. at 319.  After such a review, the Court concludes that the record does not contain evidence that petitioner intended for a robbery to occur.  The Court focuses first on the evidence as to what occurred prior to the shooting, then considers the post facto circumstantial evidence.

### a.     Evidence As to the Events Before the Shooting

Evidence regarding the events that occurred before the shooting would be the most probative as to what petitioner intended to occur during the second meeting with the MacNamees on February 8, 1998.  The state court cited only one pre-shooting fact as proving petitioner's intent: that he brought "Macho, who owed him money, to Atwood Road, where the MacNamees would be waiting with money." Rodriguez, 809 EDA 2002, at 10.  However, the en banc Superior Court misstated this evidence.  It is true that Casiano stated, "Macho got out and started to talk to my cousin about some money that [Macho] had to pay to [petitioner]."  (10/13/99 Tr. 31.)  Casiano's testimony, however, immediately segued to the conversation between Macho and petitioner about whether petitioner could sell Macho more cocaine; he never testified as to the

resolution of the outstanding debt.  (Id.)  The only other testimony regarding the debt was that of petitioner, who stated that Macho paid the debt, in the amount of $2500.  (10/14/99 Tr. 20–21.) He further stated that Macho got in the car because he wanted a quarter of a pound of cocaine from petitioner immediately, but petitioner did not have that quantity on hand.  (Id.)  Petitioner said that he would "take care" of Macho by getting the cocaine as soon as he finished the deal with Steven MacNamee.  (Id.)  In light of this testimony, the state court's reliance on the debt as evidence of an intended robbery is unpersuasive and unreasonable.

Putting aside the testimony as to the debt, and even viewing the evidence in the light most favorable to the Commonwealth, the remaining pre-shooting evidence is far too meager for this Court to conclude that the state court's decision to uphold petitioner's conviction was reasonable.  Steven MacNamee testified that he was undertaking a drug transaction with petitioner much like many they had consummated before.  This testimony does not establish intent for a robbery to occur.  Steven MacNamee's testimony in the events leading up to the shooting does not demonstrate that anything was out of the ordinary.  Nothing about the parties' haggling over price discloses any evidence that petitioner and Steven MacNamee were doing anything other than begrudgingly reaching a compromise as to price, nor does it support an inference that petitioner would want to rob Steven MacNamee himself or engage Macho to do so.  Steven MacNamee admitted that the presence of Macho and Casiano did not bother him because it was "common" for petitioner to "bring two other people with him" to a marijuana transaction.  (10/6/99 Tr. 60–61.)  Steven MacNamee only requested that petitioner get in the car alone because Steven MacNamee wanted the transaction to be quick, (id. at 27, 30), and he further stated that he was not fearful of petitioner, (10/5/99 Tr. 69), and that the "concern wasn't there" when petitioner began speaking Spanish in the back seat, (id. at 68).

The testimony of petitioner and Casiano provided the other evidence as to what petitioner intended by bringing Macho to the transaction.  Petitioner and Casiano both stated that Macho came along because he wanted to make a purchase from petitioner immediately after the transaction with Steven MacNamee.  (10/13/99 Tr. 30–32, 99 (Casiano), 10/14/99 Tr. 19–21 (petitioner).)  Nothing in that testimony demonstrates intent to rob.  Furthermore, nothing in the record confronts the fact that, absent further explanation, it would be illogical for petitioner to rob or kill someone who, by all accounts, was a reliable and steady client.[17]  Even under the standard on which the Commonwealth relies, (Gov't Resp. 28)—that "[t]he least degree of concert or collusion in the commission of the offense is sufficient to sustain a finding of responsibility as an accomplice," Commonwealth v. Rosario, 652 A.2d 354, 364 (Pa. Super. Ct. 1994)—the evidence is insufficient to sustain petitioner's conviction.  There simply is no evidence that he colluded or acted in concert with Macho to commit a robbery.

> **b.      The Post Facto Circumstantial Evidence is Insufficient to Sustain Petitioner's Conviction**

Having concluded that there was no evidence that petitioner intended for a robbery to take place when he went to the second meeting with Steven MacNamee, the Court addresses whether circumstantial evidence of petitioner's actions after the shooting is sufficient to

---

[17] In its opposition to the Petition, the Commonwealth asserts a ground not discussed by the en banc Superior Court—that the men in the backseat had a conversation in Spanish shortly before the shooting.  (See Gov't Resp. 28.)  The Commonwealth overstates the probative value of the case it cites, Commonwealth v. Rios, 721 A.2d 1049 (1998), which held—in a footnote—that conversation in a foreign language not understood by a victim may demonstrate "a unity of criminal purpose" to establish conspiracy liability.  Id. at 1053 n.13.  The evidence of intent in Rios was overwhelming: inter alia, the defendant worked with a co-conspirator to bind the victims and hold them at gunpoint; he also "repeatedly smashed [the victim's] head against the concrete basement floor, held him at gunpoint, allowed the co-conspirator to hold him at gunpoint", and stated that the victim "deserved to be shot."  Id. at 1053.  There is no comparable evidence in this case.

demonstrate intent.  The <u>en banc</u> Superior Court gave significant weight to that evidence, stating that "(2) driving Macho from the scene after the shooting; (3) taking Macho to a pay phone; (4) waiting for Macho to call others; and (5) switching getaway cars" established the necessary intent for accomplice liability as to second-degree murder.  <u>Rodriguez</u>, 809 EDA 2002.

The Commonwealth may sustain its burden even by relying wholly on circumstantial evidence.  <u>See</u> <u>Jackson</u>, 443 U.S. at 324–25; <u>Paez v. O'Lone</u>, 772 F.2d 1158, 1160 (3d Cir. 1985).  In a sufficiency-of-the-evidence habeas case involving a conviction for first-degree murder on accomplice liability, the Third Circuit observed that "[m]ere presence at the scene of the offense is not sufficient to establish culpability as an aider and abettor, nor is presence at the scene in combination with flight from the scene."[18]  <u>Moore v. Deputy Comm'r(s) of SCI-Huntingdon</u>, 946 F.2d 236, 244 (3d Cir. 1991) (citing <u>Commonwealth v. Goodman</u>, 350 A.2d 810 (Pa. 1976), <u>Commonwealth v. Jones</u>, 435 A.2d 223, 225 (Pa. Super. Ct. 1981)).  That holding applies here: no evidence in the record shows that petitioner's conduct after Macho shot the MacNamees was anything more than fearful flight from a scene at which a customer had unexpectedly shot two men.

A single piece of evidence in the record that would arguably support the inference that petitioner intended to commit a robbery is petitioner's admission that he took the drugs with him when he got out of Steven MacNamee's car after Macho began shooting.  (10/14/99 Tr. 25–26.) This admission, however, does not support an inference of intent.

The <u>en banc</u> Superior Court did not discuss this fact in its analysis of whether petitioner had "the intent of promoting Macho's actions," <u>Rodriguez</u>, 809 EDA 2002, at 10, although it

---

[18] Pennsylvania's accomplice-liability statute at the time used an "aiding and abetting" standard. <u>Moore</u>, 946 F.2d at 244.

referenced it in one part of its factual summary, writing, "Macho took the cash, and Rodriguez

took the drugs." Id. at 9.  However, thorough review of the state court record shows that this

sentence is half erroneous: the record is devoid of any evidence that "Macho took the cash."

Indeed, the en banc Superior Court implicitly acknowledged that deficit, adopting elsewhere in

its opinion the trial court's recitation of the facts, in which the money never changed hands from

the MacNamees to the men in the backseat during the failed transaction.[19]  See Rodriguez, 809

EDA 2002, at 2.  The evidence was that the drugs were in petitioner's possession when Macho

began shooting, and there is no analysis-worthy evidence as to what happened to the money after

the shooting began.[20]  Accordingly, petitioner's admission that he took the drugs with him when

he left the car is of no help to the Commonwealth in establishing an intent that a robbery occur.

### c.    Conclusion

When conducting a Jackson analysis, a district court "'faced with a record of historical

facts that supports conflicting inferences must presume—even if it does not affirmatively appear

---

[19] The trial court's discussion of the disposition of the drugs and money was limited to the
statement that "David Rodriguez and Macho took the narcotics and the money and ran toward
their car where Casiano was sitting."  (Trial Ct. 1/19/01 Op. 3.)  Those facts, if true, would
support an inference of robbery, but that conclusion has two fatal flaws.  First, in making this
statement, the trial court cited the testimony of petitioner and Casiano, not the testimony of
Steven MacNamee, as discussed further infra in note 20.  (Id.)  In petitioner's testimony, the
money remained in the MacNamees' possession after the shooting because the MacNamees
"took it back" when the deal was unsuccessful.  (10/14/99 Tr. 25.)  Neither petitioner nor Casiano
testified as to what happened to the money after Macho began firing.  Second, the portions of the
record cited by the trial court, pages thirty-eight through forty of the October 13, 1999, transcript
and pages twenty-three through twenty-four of the October 14, 1999, transcript do not say what
the trial court claims they say.  Those pages refer to petitioner taking the drugs with him from the
MacNamees' car, but they contain no reference to either petitioner or Macho taking the money.

[20] Steven MacNamee testified at trial that the money had exchanged hands before the shooting
began. (10/4/99 Tr. 57–58, 60; 10/5/99 Tr. 17.)  However, this testimony was shown on cross-
examination to be inconsistent with Steven MacNamee's statement to police and his preliminary
hearing testimony.  (10/6/99 Tr. 45–55.)  Moreover, neither the trial court nor the en banc
Superior Court analyzed or cited Steven MacNamee's testimony.

in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'"  McDaniel v. Brown, 130 S. Ct. 665, 673 (2010) (quoting Jackson, 443 U.S. at 326).  However, this is not a case of conflicting inferences; it is a case devoid of anything more than pure speculation regarding petitioner's intent.  The en banc Superior Court, as well as the trial court, improperly and unreasonably avoided the requirement that a person convicted of felony murder on an accomplice-liability theory must have intended for a predicate offense to occur.  The insufficiency of the record in this case is clear, particularly when compared to the Pennsylvania cases upholding liability for second-degree murder on an accomplice liability theory, all of which had far more robust evidence of intent.  See Commonwealth v. Lambert, 795 A.2d 1010, 1021, 1023–24 (Pa. Super. Ct. 2002) (defendant drove burglar to scene of crime "for a single purpose, i.e., so that Co-Defendant could burglarize [the victim's home]" and remained "as an active participant" at the scene"); Commonwealth v. Laudenberger, 715 A.2d 1156, 1160 (Pa. Super. Ct. 1998) (defendant, inter alia, "discussed and planned the robbery with [his] co-defendants for up to a half-hour"); Commonwealth v. Cristina, 391 A.2d 1307, 1311 (Pa. 1978) (defendant "agreed to help [co-defendant] break into 'some guy's apartment'").

Petitioner's actions were reprehensible and likely criminal,[21] but that does not justify stretching Pennsylvania's second-degree murder statute beyond the boundaries of due process as guaranteed by the Fourteenth Amendment to the Constitution.  The en banc Pennsylvania Superior Court acted unreasonably in doing so.

---

[21] See, e.g., 18 Pa. Con. Stat. Ann. § 5105(a) (making it unlawful to render aid to persons who have committed crimes, such as providing transportation to avoid apprehension).

### iii.   The Trial Court's Verdicts and Rationale For Its Verdicts Support a Finding of Unreasonableness

In analyzing petitioner's claim, this Court reviewed the record of his trial with two layers of deference: by affording the presumption of correctness due to state court decisions under AEDPA and by viewing the evidence in the light most favorable to the Commonwealth.  See Orban, 123 F.3d at 731; see also Renico v. Lett, 130 S. Ct. 1855, 1864 (2010) (holding that, on habeas corpus review, a district court may overturn a petitioner's conviction only if the state court's decision was "objectively unreasonable").[22]  Even under that deferential standard of review, as set forth above, the Court has concluded that petitioner is entitled to relief.

Further undermining the en banc Superior Court's ruling are the trial court's verdicts and the statements it made when rendering its verdicts.  The parties have argued extensively in prior postconviction proceedings in this case regarding inconsistent verdicts and the legal effect of the statements the trial court made on October 18, 1999, regarding her conclusion that it was not petitioner's "intent to commit a robbery."  (10/18/99 Tr. 6–13.)  This Court does not rely on either of those factors in reaching its conclusion.  However, the Court notes that the trial court acquitted petitioner of robbery, the purported predicate offense for second-degree murder.  Despite that acquittal, and despite stating that "it was not David Rodriguez's intent to commit a robbery," the trial court convicted petitioner by using a theory borrowed from torts: petitioner was guilty because he was "the party that was responsible for the drug transaction and the drug

---

[22] Petitioner cited Johnson v. Mechling, 446 F. App'x 531 (3d Cir. 2011), in support of his argument that the en banc Superior Court's conclusion as to accomplice liability was unreasonable.  On May 29, 2012, the Supreme Court summarily reversed the Third Circuit in a per curiam opinion, holding that the Third Circuit "unduly impinged on the jury's role as factfinder" by engaging in "fine-grained factual parsing."  Coleman v. Johnson, No. 11-1053, 566 U.S. __, slip op. at 5–6 (May 29, 2012).  This Court is not reweighing the evidence introduced at petitioner's trial, which, as Johnson reaffirms, is prohibited when evaluating a Jackson claim.  Rather, the Court finds that there was a complete lack of evidence to support a finding of intent, and the en banc Superior Court was unreasonable in concluding otherwise.

transaction resulted in a robbery and a robbery is a felony crime which when attendant to a homicide results in a verdict of second-degree murder."  (Id.)  As discussed in this Memorandum, that logic is flawed.  In borrowing from tort law, the trial court ignored the firmly settled requirement under Pennsylvania law that an accomplice act "with the intent of promoting or facilitating the commission of [an] offense."  18 Pa. Cons. Stat. § 306(c)(1).  Legal nullity or not, the trial court's logic, echoed in substantial part by the en banc Superior Court, buttresses the conclusion that petitioner's conviction was based on an unreasonable application of the sufficiency-of-the-evidence standard.

### 5.      Conclusion

This Court concludes that the en banc Pennsylvania Superior Court acted unreasonably in determining that "the evidence admitted at trial and all reasonable inferences drawn therefrom, when viewed in the light most favorable to the verdict winner," Rodriguez, 809 EDA 2002 at 6, supported a finding that petitioner intended to aid Macho in committing a robbery.  This is a violation of the Fourteenth Amendment's due-process requirement that a person be convicted only "upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."  In re Winship, 397 U.S. at 364.  Accordingly, petitioner's first and third objections to the R&R are sustained, and his second-degree murder conviction is vacated.  See Robertson, 580 F.3d at 167 (holding that a habeas petitioner was entitled to relief because the Pennsylvania Superior Court unreasonably applied clearly established federal law).

### E.      Petitioner's Aggravated-Assault and Attempted-Murder Convictions Must Also Be Vacated

In his Petition, petitioner also asserted that the Court should vacate his convictions for aggravated assault and attempted murder due to insufficient evidence.  (Pet. 5.)  The parties have rightly focused their arguments on petitioner's second-degree murder conviction, yet the

aggravated-assault[23] and attempted-murder[24] counts must also be vacated.  All three convictions in this case were based on the same theory of accomplice liability as set forth in Title 18, Section 306(c) of Pennsylvania Consolidated Statutes (version effective 1998).  (See, e.g., 10/18/99 Tr. 6–13 ("I also find you guilty through the same theory of accomplice liability of aggravated assault and attempted murder of Steven MacNamee.").)  The en banc Superior Court's analysis of petitioner's liability as Macho's accomplice applied to all three counts.  Rodriguez, 809 EDA 2002, 10–11 ("[W]e find that the evidence showed that Rodriguez aided and cooperated with Macho to an extent sufficient to find him culpable of second-degree murder, aggravated assault, and attempted murder, all under the theory of accomplice liability.").  In fact, the en banc Superior Court's discussion of the five pieces of evidence that allegedly proved petitioner's "aid with the intent of promoting Macho's actions," discussed supra, was the extent of its analysis of the aggravated assault and attempted murder convictions.  This Court has already found that analysis to be an unreasonable application of the constitutional requirement that a conviction be supported by sufficient evidence.  Therefore, this Court's reasoning applies with equal force to all three counts, and the aggravated assault and attempted murder counts must also be vacated.

## V.    CONCLUSION

In rejecting petitioner's sufficiency-of-the-evidence challenge to his convictions, the en banc Pennsylvania Superior Court unreasonably applied clearly established federal law. Accordingly, for the foregoing reasons, the Court sustains petitioner's first and third objections to the R&R and grants the Petition.

An appropriate Order follows.

---

[23] 18 Pa. Cons. Stat. § 2702 (version effective 1998).

[24] 18 Pa. Cons. Stat. Ann. §§ 901, 2502 (version effective 1998).